Arthur Cockrell v. The State.

No. 747.   Decided October 26, 1910.

**1.—Assault with Intent to Rape—Continuance—Original Testimony—Impeaching Testimony.**

Statements of parties made subsequent to a given transaction that is under investigation, which might be contradictory of their testimony upon the witness stand would be impeaching testimony, and would not entitle the party to a continuance, but statements of parties antedating a given transaction, showing motive, feeling, prejudice and unfriendliness toward a party who is accused of an offense would be admissible as original testimony and entitle defendant to a continuance.

**2.—Same—Evidence—Motive—Ill-Will—Prejudice.**

Where, upon trial of assault with intent to rape, defendant's motion for a continuance showed that the absent testimony would show that the prosecutrix was very unfriendly towards the defendant and had often stated before the alleged occurrence that she would get even with him for some wrong which she claimed the defendant had done her, it was reversible error to overrule said motion; as said testimony was original and could not be considered as impeaching testimony.

Appeal from the District Court of Panola.   Tried below before the Hon. W. C. Buford.

Appeal from a conviction of assault with intent to rape; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*J. G. Woolworth* and *H. N. Nelson,* for appellant.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, Judge.—Appellant was tried and convicted in the court below of assault with intent to rape and his punishment assessed at confinement in the penitentiary for a period of three years; hence this appeal.

We find in the record a bill of exceptions to the action of the court in overruling the defendant's application for a continuance. The bill of exceptions discloses that the diligence was sufficient, and further, that when the application for continuance was presented in the court below the same was overruled by the court on the statement of the district attorney that he would procure the attendance of said witnesses.   On the trial of the case the prosecuting witness, Eliza Hanson, being sworn, testified that her name now is Mrs.

Eliza Holmes, having married Holmes after the alleged commission of the offense. The witness continuing stated that she lived in Panola County, Texas, with her father, and that on the 27th day of May her father left home, leaving herself and Mrs. Louden at the house; that their house was situated on the banks of the Sabine River, and on that day the river was very high and that there was a slough between the house and the mainland, and in time of high water it cut off the house from the mainland; that in order to get to the mainland they had to go across the slough in a boat; that it was understood that she was to go out that evening and Mr. Madden was to come and get her; that the defendant came and took Mrs. Louden across; that Mrs. Louden left after dinner and the defendant took her across the back water, and after Mrs. Louden left the defendant came to the house where she was alone and stated that he came after a square, and witness told him that it was at the mill, she supposed; that the defendant walked toward the mill and was gone some ten or fifteen minutes and then came into the hall of the house and at· that time she was sewing. Continuing the witness says: "I did not invite him into the house. I don't know how came him to come into the house—when he came in the house he talked on a general conversation about his wife. He was a married man at that time but had parted from his wife. After he stayed there a little while I got up and started out the door and seen him in the hall door and when I got up he begin to walk around the room and he came up to me with the most hideous grin on his face I ever saw and I knew something was the matter and he says, I want you to give me some, and you have got to give me some and I didn't answer him, and I went and sit down to the machine and begin to work and he come over there and grabbed hold of my arm and says you have got to give me some, and I says, no, I won't, and I will tell papa, and he says, you can't, and I will have it or kill you and then have it. He did take hold of me with the fiercest grip I ever had, and I still suffer with my arm from it— he just grabbed hold of my arm and jerked me, and I screamed, and he begin to pace around the room and I told him to turn me loose and he said he was going to have it if he had to kill me, and would throw me in the back-water and papa would not know what became of me, and I told him he would not, that he was afraid to, and I got up from the machine, just walking backwards and starting to run, and I turned and faced him and begin to run backwards and he was going after me and I passed one of the doors going backwards; I picked up a little old pistol that happened to be left there on the dresser as we made up the beds, I reckon, and I had it in my hand pulling the trigger and it wouldn't do anything but just squeak. Q. 'Just go ahead and state to the jury the very exact words that he used to you; you will have to do that.' A. 'He said if I didn't let him fuck me he said he would cut my

throat and have it anyway, and he run his hand in his pocket to get his knife out and he heard some one holler and he ·jumped out of the door and run.' When he said he would cut my throat and have it anyway I was running backwards screaming, and someone hollered—I heard them—I suppose it was Mr. Madden that hollered, and the defendant jumped off the gallery and run. This was in Panola County, State of Texas. Mr. Madden came there after the hollering—Mr. Madden is at court now. I don't know how long it was before Mr. Madden came—it seemed like an awful long time to me, but I don't suppose it was more than a few minutes. After defendant jumped off the gallery, I didn't do nothing more than run in the room and ring the telephone just as soon as he jumped off the gallery. I rang up my aunt. I did not make a statement to her over the 'phone of what had happened—I did speak of some trouble over the 'phone." On cross-examination ·she testified: "My father and six brothers and Mrs. Louden and ·her children stayed at our house the night ·before this occurrence. My father and the children and mother went about 9 o'clock to go to Logansport, La., and left Mrs. Louden there with me." On redirect, for the State, she stated: "Arthur Cockrell did unbutton his clothes there that day." Continuing on cross-examination: "They left Mrs. Louden there with me and she stayed there until after dinner. Mrs. Louden is Mrs. Mollie Pinkerton—she stayed there until after dinner, and the house where we were at was surrounded by back-water. I don't know how she got out from the house across the back-water. I don't know who set her across the back-water as I was in the house then, but she has told me who set her across. I was not present at the time she got across the back-water. This trouble occurred between one and two o'clock in the day. I didn't know who it was that set her across the back-water. I don't know how long after she was set across the back-water before the defendant appeared at the house—might have been half an hour and might have been longer. The defendant came there and asked me for a square, but he did not tell me what he wanted with the square. 'Q. How long after you say that this occurred before Mr. Madden got there?' 'A. Why, I don't know—it was not very long—it was not but a few minutes, I suppose.' I was on the edge of the back-water when I saw Mr. Madden. I didn't call Mr. Madden, but I just screamed and he answered. I didn't call Mr. Madden—I didn't call anyone—just screamed. Madden did come over with the boat afterwards and carried me out. The defendant did grab hold of my arm and I jerked loose from him. I know Lee Ferguson, and he was justice of the peace at Joaquin. I think they sent for him the night after this occurred. I didn't make any statement to him of what occurred, because I didn't have mind enough to do it. I didn't tell Mr. Ferguson that the defendant just made improper remarks to me and that he didn't take hold of me at all, nor did

I say that in Mr. Ferguson's presence. I don't know how long it was after Mrs. Louden left before the defendant appeared at the house and asked me for a square, but it was a while after dinner, guess between one and two o'clock when he came. I suppose it is 350 or 400 yards from the house where I was at to the house known as the Jackson house. I don't remember, but I think at that time there was back-water between the Jackson house and the house where I was. I think you would have to go part of the way from the house where I was at to the Jackson house in a boat. Mr. Gus Madden was the first person I saw after the occurrence and I didn't tell Mr. Madden what had happened. Mr. Madden asked me what was the trouble, and I told him that Cockrell had grossly insulted me. I had known the defendant about three or four or five years, but we had not as young folks associated together a great deal. He boarded at our house while he was at work at the mill, but he never as young folks kept company with me, or anything of that kind. I did not have any hard feelings towards the defendant before this occurred, and I never did tell Drummond Diggs that I was mad at him or that I had any hard feelings towards defendant. I am acquainted with Drummond Diggs and I have seen him. Am acquainted with Henry Hunt—he worked at the mill at one time. I never did tell Henry Hunt before this occurrence that I was mad at the defendant and expected to get even with him sometime, and I did not ever have a quarrel with the defendant at Henry Hunt's house at a dance on any occasion." Again on redirect examination she testified: "I did tell Mr. Nelson that when the officer, Mr. Ferguson, came that night that I was broke down and nearly crazy. Gus Madden came there immediately after the defendant left." The State introduced the witness Madden, who stated that he lived about a mile from the Hanson place, and on that day was chopping cotton and was about 300 yards from the Hanson house. He says he saw the defendant; that he came into the field where he was chopping cotton and asked for the boat, and he, defendant, stated that he was going down to the Jackson house to get a square. This Jackson house was across the back-water and close to the Hanson house. The witness says he told him where the boat was and also told him to bring the ladies out; that the defendant promised to do so; that he saw the defendant put Mrs. Louden across; that he heard the prosecutrix scream, and that he was some 300 or 400 yards from her and that he immediately started toward her; that when he got to the house the young lady was crying; that just as he got to the bank, or the back-water, the defendant, who was between fifty and one hundred yards from him, called him and told him that there was the boat, defendant having moved it from where witness had it placed; that at the time the witness started to the Hanson place the defendant was across the back-water and was 250 yards from the house and between fifty and one hundred yards from wit-

ness. In the application for continuance defendant sets up that he desired the testimony of the witnesses Henry Hunt, Drummond Diggs and Lawrence Whitlock, by whom he expected to prove that the prosecuting witness was very unfriendly toward the defendant and often stated that she would get even with him for some wrong she claimed he had done her. It may be stated that the defendant took the stand in the case and testified, denying vehemently that he made any assault upon the prosecuting witness. He stated his purpose in going across the back-water was to get the square; that he took Mrs. Louden out; that the prosecuting witness did not go because she was not through with her sewing; that he had a conversation with the prosecutrix in which conversation she insisted that he should tell her what a certain party said about her; that he did not want to tell her, but she insisted upon it, and when he told her this, she seemed to get mad; that he left and went across the back-water in the boat, and when he got across he heard her hollering for Madden to come after her. In view of the testimony in the case and in the light of the surroundings of the parties, we are of opinion that the defendant was entitled to this testimony to show the motive as well as the feelings of the prosecutrix toward the defendant. This was original testimony and can not be considered as impeaching testimony. We are aware of the rule that usually continuances will not be granted to impeach a witness, but defendant would be entitled to make proof of these statements without laying a predicate for the introduction of same. Statements of parties made subsequent to a given transaction that is under investigation that might be contradictory of their testimony upon the witness stand would be impeaching testimony, and defendants under such circumstances would not be entitled to a continuance to procure such testimony, but statements of parties antedating a given transaction showing motive, feeling, prejudice and unfriendliness toward a party who is accused of an offense, would be admissible as original testimony in the trial of cases. We are, therefore, of opinion that the court erred in not granting the continuance in this case and for this reason the case will have to be reversed. We make no comment upon the sufficiency or insufficiency of the evidence. There are other questions raised in the record that it is not necessary to pass upon as it is not likely to occur upon another trial.

For the error indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*