### J. A. Eppison v. The State.

#### No. 4523.   Decided November 14, 1917.

**1.—Pandering — Evidence — Cross-examination — Motive — Husband and Wife.**

Where, upon trial of pandering, defendant's wife and another party, who had devoted his attentions toward her, furnished the incriminating testimony, and defendant's cross-examination of said wife appears to have been legitimate, the motives of said witnesses were relevant and the State had the right to have said wife of defendant make legitimate explanation of circumstances developed upon cross-examination to weaken her testimony, but the State should not have gone into detail too minute or remote of the transaction inquired about.   Prendergast, Judge, dissenting.

**2.—Same—Continuance—Motion for New Trial—Practice on Appeal.**

Where, upon trial of pandering, defendant sought to postpone or continue the case on account of the testimony of an absent witness, for the purpose of throwing light upon the motives of his wife, who was the principal witness against him, and to corroborate the defendant in his denial of her statements, the court, in view of the testimony adduced upon trial, should have granted a new trial though there was lack of diligence in defendant's application for continuance which justified the trial court in overruling it, and the affidavit supporting the motion for new trial should have been considered.   Following Stewart v. State, 52 Texas Crim. Rep., 100, and other cases.   Prendergast, Judge, dissenting.

**3.—Same—Charge of Court—House of Prostitution.**

Where, upon trial of pandering, the State claimed that the defendant placed his wife in a house of prostitution to have sexual intercourse with other men, etc., and the character of the house to which he took her was sharply in issue, and defendant claimed that he did not take his wife to a place where prostitution was carried on, and the court's charge submitted the law from the State's standpoint and defined a house of prostitution, but failed to submit the issue from the standpoint of defendant, although duly requested to do so, the same was reversible error.   Prendergast, Judge, dissenting.

Appeal from the District Court of Bowie.   Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of pandering; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*D. Ward Stuart, E. E. Weaver,* and *E. Newt Spivey,* for appellant.— On question of overruling application for continuance and motion for new trial:   Carter v. State, 170 S. W. Rep., 739.

*E. B. Hendricks,* Assistant Attorney General, for the State.

MORROW, JUDGE.—This appeal is from a judgment condemning appellant to confinement in the penitentiary for ten years for the crime of pandering.

The State's case is supported in the main by a witness by the name of Jones and the wife of appellant.

On behalf of the State Mrs. Eppison testified that after a very short

acquaintance she and appellant were married in June, 1916, and after living together for seventeen days a separation took place, and she left Texarkana, going to Paris, working in a confectionery store for her uncle. She claimed to have left her husband because he wanted her to lead an immoral life. After leaving him he wrote her letters seeking a reconciliation, and in October went to see her on the same mission. Encouraged by her mother to return to him, she went to Texarkana for that purpose, having received money sent her by her husband to pay her expenses. She reached Texarkana in the evening and was taken by her husband to the Mecca Rooms. Soon thereafter Charlie Jones was brought to see her by appellant, who insisted that she submit to Jones' embraces and complained because she refused to do so, and finally upon his urging she went to Jones' room but found him asleep. The house was kept by a woman named Mrs. Isonhauser. One other woman lived there, and this woman, Mrs. Eppison claimed, was a prostitute. After remaining at the Mecca Rooms for several days she and her husband went to another rooming house called the Como Rooms, which she claimed was a place of ill-fame, and at which her husband insisted upon her having intercourse with men. Remaining at the Como house about an hour, she left in company with Jones, went to a show and after the show to the Savoy Hotel, which was across the Texas line in Arkansas. She stayed at the Savoy Hotel one night at Jones' expense but without any improper relations with him. Afterward fell into the hands of Mr. Henry, a white slave officer. This substantially is her evidence.

Charlie Jones, a married man, forty-two years of age, claimed that he went to the Mecca Rooms at appellant's request, appellant stating that anything could be had, whether a crap game or a good looking woman, and that his wife was there and Jones could stay with her; that he saw Mrs. Eppison at the Mecca Rooms and asked her if she wanted to stay with him; told her she did not have to, and that she declined and said she did not want to lead that kind of life, and that he told her she did not have to do so, Eppison being absent at the time of this conversation; that a day or two later she met him at a restaurant and told him that appellant was going to take her to the Como rooming house, where she did not want to go, and asked his advice. Later he found her at the Como and took her to the Savoy Hotel, where he rented a room; took her to the picture show that night, gave her a small sum of money and told her he would send her to his wife at Kansas City; that she subsequently, after separating from her husband, went back to the Mecca Rooms and remained about two weeks, where he (Jones) paid for a room part of the time; that she left with a man named Arnold, and Mr. Henry, white slave officer, investigated the matter. He claimed that the Mecca Rooms had a bad reputation and that the woman Hagerman, who stayed there, was a prostitute, and that the Como Rooms was also a house of prostitution. After returning to the Mecca Roms she was visited several times by the white slave officer, and

he made no protest against her remaining there. He said he had heard nothing of its ill-fame.

On cross-examination Mrs. Eppison testified that she had married a man named Ector when about fourteen years of age and had lived for about a year with a man named Wilson under the guise of husband and wife. That during this time she lived with Wilson at the house of a man named Harold Arnold in Titus County, also in Texarkana and Little Rock; that Wilson was a thief and a crook; that after Jones took her to the Savoy Hotel she left there with a barber by the name of Arnold.

On redirect examination the State proved by Mrs. Eppison that when she was a small child her father and mother were mean to her, beat and abused her, made life unpleasant for her, forced her to marry a half Indian when she was fourteen years of age. That her first husband was also cruel to her, beat and abused her and permitted other people to do so; that after living with him nine months she went off with Wilson. She was permitted to go into details of Wilson's treatment of her, which in substance shows that he forced her to have intercourse with him and that during the year she lived with him as man and wife she did so through fear of Wilson, who whipped her, beat her, placed a gun against her head and breast and threatened to shoot her. That she lived with him several months in Titus County, Texas, about three months in Texarkana and a short time in Little Rock, where he was arrested and sent to the penitentiary, she testifying as a witness against him.

There was a sharp issue of fact with reference to the reputation of the Mecca rooming house, it appearing that Mrs. Isonhauser had recently taken charge of it, she testifying that there was nothing wrong took place there during her occupancy. Most of the testimony with reference to its reputation related to a time antedating the time of Mrs. Isonhauser's tenancy. After she took charge none of the original roomers remained. Jones' testimony with reference to his conversation with appellant was denied by appellant and contradicted by another witness. This witness also claimed that Jones solicited Mrs. Eppison to accompany him to another room and that Jones had gone to the house on request of the Hagerman woman. Appellant claimed that he had been employed to solicit patronage for Mrs. Isonhauser's rooming house and that he had no knowledge of anything wrong there, and denied his wife's statements of his improper conduct toward her, claiming that he did not know the cause of her leaving; that he had written her mother and gone to see her, and that she came back to him at his solicitation, he sending her the money. A letter from Jones to Mrs. Eppison, written after she left her husband and while she was at the Mecca place, was identified and read in evidence, which is as follows:

"Dec. 14, 16.

"Dear Daughter: I am so surprised at the choice that you have taken, and so is Mr. Henry, but you know your mind best. After what I saw last night I went home thinking about you, but I will never say

anything about what I saw to anyone. Believe me, my best wishes go to you. I never will get in that much trouble for anyone else again. I have lost my faith in anyone. You know and Mr. Henry knows my intentions were the best. As far as this man Pollard is concerned, I will meet him in Kansas City, Missouri, and hell will break loose. Please call me up before nine o'clock and I will say goodbye. From one that thinks more of you than anyone else does.

"Cas. A. Jones.

"The old lady wants you for a drawing card for her house, and you know it. Now if you find yourself slipping let me know. Please answer if you think anything of me, but destroy as soon as you see this letter. C."

Appellant objected to the details of her past life and they were admitted on the ground, as explained to the court, that in the cross-examination appellant had gone minutely into her life and refused to permit her to make an explanation.

Appellant's cross-examination of his wife appears to have been legitimate. There was ground for question of her relations with Jones and his intentions towards her and appellant. The incriminating evidence against appellant came from Jones and Mrs. Eppison. Their motives were proper subject of inquiry and the facts throwing light upon them were relevant. O'Neal v. State, 122 S. W. Rep., 386; Wigmore on Evidence, secs. 948 and 949; Wharton's Crim. Evidence, sec. 488.

The State's right to have Mrs. Eppison make legitimate explanation of circumstances developed on cross-examination tending to weaken her evidence can not be questioned. Branch's Ann. P. C., p. 62; Wigmore on Evidence, sec. 952. In the exercise of this privilege the State should not have gone into details so minute or transactions so remote. Proof was made of occurrences in the early life of the witness, of mistreatment by her father and mother, cruelty of her first husband, her betrayal and outrage by Wilson, and his subsequent restraint and abuse of her.

Appellant sought to postpone or continue the case to procure the testimony of Harold Arnold, who testified that during 1914 Mrs. Eppison lived at his house with Elmer Wilson, claiming to be his wife and going under the name of Cleo Wilson; that she did housework for witness and that Wilson was a laborer in his field; that she quit his employ after some months and resided with Wilson near the witness' house; that she and Wilson were very affectionate toward each other; that she was foolish over him; that she would follow him to the field almost every day, and that at no time did he notice any indication or evidence of duress on the part of Wilson. A bill of exceptions was reserved to the court's action in overruling this application for a continuance in the absence of this testimony and attached to the motion for a new trial is the uncontroverted affidavit of Arnold to its truth.

We think, in view of the testimony drawn out on the redirect examination of Mrs. Eppison and referred to above, that the testimony of

Arnold was admissible not only to impeach Mrs. Eppison but to throw light upon her motives and corroborate the appellant in his denial of her statements. Bader v. State, 57 Texas Crim. Rep., 293; Parker v. State, 62 Texas Crim. Rep., 64; Wigmore on Evidence, sec. 1135.

Though there was lack of diligence shown in application for a continuance which justified the trial court in overruling it, it, with the affidavit supporting it, were proper factors to be considered on the motion for a new trial. Tull v. State, 55 S. W. Rep., 61; Stewart v. State, 52 Texas Crim. Rep., 100; Cockerel v. State, 60 Texas Crim. Rep., 124; Collins v. State, 148 S. W. Rep., 1065; Rushing v. State, 62 Texas Crim. Rep., 309. And by this court in reviewing the action of the trial court in overruling such motion. Rumbo v. State, 28 Texas Crim. App., 30; Clark v. State, 30 Texas Crim. App., 377; Walker v. State, 32 Texas Crim. Rep., 175; Logan v. State, 39 Texas Crim. Rep., 573; Hardin v. State, 40 Texas Crim. Rep., 208; Lopez v. State, 52 Texas Crim. Rep., 226; Pressley v. State, 60 Texas Crim. Rep., 102; Branch's Ann. P. C., sec. 338.

The State proved by Mrs. Eppison that her relations with Wilson were brought about by brute force and continued by violence and threats. By the testimony of the absent witness was shown that she lived with Wilson for months without complaint and that she had opportunity to disclose the outrage and free herself from restraint.

On hearing the motion for new trial the court had before it the knowledge of Arnold's testimony; the fact that the main witness against appellant was a young woman who had had many episodes with men, and at the time occupied questionable relations with the chief corroborating witness—Jones; the fact that a serious verdict against appellant had been rendered in a case where this young woman had been permitted to recite a touching story, relating a series of wrongs committed against her by others than appellant, in his absence and without his participation or knowledge.

In the light of this record we think a new trial should have been granted.

The court in his main charge submitted the case to the jury in the following language: "Now, if you believe from the evidence beyond a reasonable doubt, that the defendant, in the County of Bowie and State of Texas, on or about the 2nd day of December, 1916, as alleged, did then and there unlawfully by abuse of his position of confidence and authority, towit: as a husband, procure a female person, towit: Bertie Eppison, to enter a place there situate in which said place prostitution was then and there encouraged or allowed, you will find him guilty of pandering as charged in the indictment, and assess his punishment at confinement in the penitentiary for any term of years not less than five." Appellant requested the following charge: "You are charged that the State is bound to show beyond a reasonable doubt that the place where Bertie Eppison was taken was a place where prostitution was allowed and encouraged, and if you have a reasonable doubt as to

this house being a place where prostitution was allowed or encouraged, then you will find the defendant not guilty and so say by your verdict."

The refusal of this charge, we think, was error. The submission of the question was put by the State's standpoint in an affirmative way. A house of prostitution was defined but the charge fails to submit the issue from the standpoint of appellant. One of his defenses was that he did not take his wife to a place where prostitution was encouraged and allowed and the character of the house to which he took her was sharply in issue. In response to the well known rule that it is incumbent upon the court, upon request, to submit to the jury appellant's theory raised by the evidence, the requested charge should have been given.

For the errors in denying the motion for a new trial and refusing special charge mentioned, the judgment of the lower court should be reversed and the cause remanded. The other assignments do not present error.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).—The opinion of the majority does not state or discuss some material questions raised. I think this should have been done, and shall proceed to do so. These questions are passed up by the majority opinion by merely saying: "The other assignments do not present error." I have studied the evidence carefully. It is much stronger against appellant than stated in the majority opinion, and some cogent evidence is omitted entirely. But it is useless now to give this testimony.

The offense is prescribed by section 1 of the Act of March 1, 1911, page 29, Vernon's Statutes, article 506a, as follows:

"Any person who shall procure or attempt to procure or be concerned in procuring, with or without her consent, a female inmate for a house of prostitution, or who, by promises, threats, violence or by any device or schemes, shall cause, induce, persuade or encourage a female person to become an inmate of a house of prostitution, or shall procure a place as inmate in a house of prostitution for a female person, or any person who shall, by promises, threats, violence or by any device or scheme, cause, induce, persuade or encourage an inmate of a house of prostitution to remain therein as such inmate, or any person who shall, by fraud or artifice, or by duress of person or goods, or by abuse of any position of confidence or. authority, procure any female person to become or remain an inmate of a house of ill-fame, or to enter any place in which prostitution is encouraged or allowed in this State, or to come into this State or leave this State for the purpose of prostitution, or who shall procure any female person to become an inmate of a house of ill-fame within this State, or to come into this State or to leave this State for the purpose of prostitution, or who shall give or agree to receive or give any money or thing of value for procuring, or attempt-

ing to procure, any female person to become an inmate of a house of ill-fame within this State, or to come into this State or leave this State for the purpose of prostitution, shall be guilty of pandering, and, upon conviction for an offense under this Act, shall be deemed guilty of a felony and shall be punished by confinement in the penitentiary for any term of years, not less than five."

The indictment is in several different counts, neither of which is either directly or indirectly based on that part of the statute pertaining to bringing a female into or leaving the State for the purpose of prostitution. The court in his charge expressly excluded the submission of all other counts except the first, which was to the effect that appellant on or about December 2, 1916, in Bowie County, Texas, did then and there unlawfully by abuse of a position of confidence and authority, towit: as a husband, procure a female person, towit: Bertie Eppison, to enter a place there situate in which said place prostitution was then and there encouraged and allowed.

Appellant contends that said statute is in conflict with the Mann White Slave Act of Congress of June 25, 1910, because of the provisions in our statute prohibiting any person from procuring a female to go into another or leave this State for the purpose of prostitution, and cites Hoke v. United States, 227 U. S., 308, and State v. Harper, 48 Montana, 456.

This court has already expressly held against appellant on this point in Hewitt v. State, 74 Texas Crim. Rep., 46. In that case the same cases and others were relied upon therein to establish the invalidity of our statute, but this court showed the distinction between our statute and the Mann White Slave Act and the Montana statute, and distinguished the Harper and Hoke cases, supra, showing that they were inapplicable to our statute. It is needless to discuss the question again.

Moreover, it is well established in both this court and the civil courts of this State as well as the courts of other States, that "When a penal law prohibits two or more acts, . . . one valid and constitutional and the other not, it may and will be held valid and constitutional, and can and will be enforced, as to that portion which is valid and constitutional. (Holly v. State, 14 Texas Crim. App., 506.)" Ex parte Kennedy, 23 Texas Crim. App., 77.

The rule is also clearly stated by our Supreme Court in Zwernemann v. Von Rosenberg, 76 Texas, 522, as follows: "The rule for the construction of statutes in partial conflict with the Constitution is, that if the portion repugnant to the fundamental law can be stricken out, and that which remains is complete in itself and 'capable of being executed in accordance with the legislative intent it must be sustained.' Ex parte Towles, 48 Texas, 412, quoting Cooley on Const. Lim., 178. If the unconstitutional provision be but incidental to the main purpose and be not essential to give effect to the statute, such part may be rejected, leaving the remainder to stand."

The Supreme Court again clearly states the rule in Railway Co. v.

Mahaffey, 98 Texas, 392, as follows: "It is settled law and now a familiar rule, that where a statute contains an unconstitutional provision and another which, if standing by itself would be valid, the latter will be given effect, provided they are so clearly independent of each other that the court can say that the Legislature would have passed it, if the former had been omitted." This principle is also universally laid down as sound by the text-book writers, as follows:

"A statute may contain some such provisions, and yet the same Act, having received the sanction of all branches of the Legislature, and being in the form of law, may contain other useful and salutary provisions not obnoxious to any just constitutional exception. It would be inconsistent with all just principles of constitutional law to adjudge these enactments void because they are associated in the same Act, but not connected with or dependent on others which are unconstitutional. Where, therefore, a part of a statute is unconstitutional, that does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it can not be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained." Cooley's Const. Lim., 215; 1 Lewis' Suth. Stat. Const., p. 583.

The rule is further correctly stated in 36 Cyc., 976, as follows: "It is elementary that the same statute may be in part constitutional and in part unconstitutional, and if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected," citing decisions from thirty-four States, the District of Columbia, and the United States courts decisions.

Another rule is as correctly stated in 8 Cyc., 787, as follows: "It is a firmly established principle of law that no one can be allowed to attack a statute as unconstitutional who has no interest in it, and is not affected by its provisions," citing the decisions of many courts and of the United States Supreme Court. Many authorities on this point could be cited.

There can be no sort of doubt but that the Legislature did not make, nor intend to make, the other unlawful acts prescribing this offense depend in any measure upon those which might be offenses by a person bringing the female from another to this State, nor taking her out of

this State into another; and that the other Acts prescribing the offense undoubtedly would have been passed without reference to those depending on taking the female from this into another or from bringing her from another into this State.

The principles above announced are equally applicable where the law of any State undertakes to deal with interstate commerce as well as intrastate matters as held by many courts, and expressly by our Supreme Court. Allen v. Railroad Co., 100 Texas, 527; 36 Cyc., 983, and cases cited in note 58.

There can be no question as to the application of these principles to our pandering statute and to appellant herein. So that in no contingency can he be sustained in his contention as to the invalidity of our pandering statute if in any contingency any part of it could be held invalid or unconstitutional.

While the evidence was in conflict on some points, there is no question but that it was amply sufficient under the law to show appellant's guilt and sustain the verdict of the jury.

The court did not err in overruling appellant's application for a postponement or continuance on account of the absence of the witness Arnold. At most the allegations would show that the testimony of this witness was for no other purpose than to tend to impeach, if it did, the testimony of the State's principal witness, and that upon not a very important point. It has always been held by this court that a continuance will not be granted for this purpose. Sec. 324, 1 Branch's Ann. P. C., where a large number of the cases are collated. Besides no diligence was used to secure his attendance.

Section 3 of the pandering Act expressly makes the wife a competent witness against her husband in prosecutions thereunder. The court did not err in permitting her to testify.

Appellant complains of this remark by the trial judge in permitting the explanation by Mrs. Eppison: "I knew when you let down the bars you would have a long siege of it." He explains and qualifies appellant's bill as follows: "The defendant's attorney while Bertie Eppison was on the witness stand, asked her all about her past life, the witness desired to make some explanations as to her life. Defendant's attorney objected to her making any explanation. On cross-examination the district attorney told her to make the explanation she desired to make. Defendant's attorney objected. I overruled the objection because the defendant's attorney had asked her all about her past life that she would be entitled to make the explanation with reference to the matters inquired about by defendant's attorney. I had notified defendant's attorney if he went into her entire past life it would let down the bars and would result in an extended investigation on both sides." What he stated was not calculated to make the jury believe that the judge was convinced of the appellant's guilt. It was in no sense a comment on the weight of the testimony, and could not have affected the jury in any way in passing on the testimony. In this connection

it will be stated what appellant complains in another bill. This other
bill—6—shows this: "The State offered to prove by Bertie Eppison
the story of her life and propounded this question: 'Go ahead, Bertie,
and just tell the whole story from beginning to end.' To which the
defendant objected; the objections being overruled, the witness stated
in substance as follows:" Then follows with some of her testimony.
Her testimony was her explanation of certain acts of her life which
had been drawn out for the purpose of impeaching and reflecting upon
her. The court explains that bill as follows: "The defendant's attor-
ney on cross-examination of this girl went into the life of the witness
minutely; at the time she desired to make an explanation this was re-
fused by defendant's attorney. I permitted the district attorney to
ask for these statements or explanations; I did so because the defend-
ant's attorney had gone into these matters at great length and I per-
mitted her to make her explanations." It is universally held that any
witness has the right to explain from his standpoint any fact tending
to create a distrust of his integrity or truthfulness. As the witness
sought to make this explanation when appellant was interrogating her,
and he refused to then permit her to do so, it was proper for the court
to permit the district attorney upon redirect examination of her to
have her then make such explanation. Sec. 94, 1 Branch's Ann. P. C.

The court committed no error in permitting the witnesses to testify
that Lou Hagerman was a prostitute. This woman was shown to be a
common prostitute, and it was into her room appellant took his wife,
and in that and an adjoining room also attempted to force her to have
sexual intercourse with another man.

The State not only proved positively by witnesses that said Lou Hager-
man was a common prostitute, but also proved by witnesses that the
Mecca Rooms, and also the Como Rooms, where appellant took and
placed his wife, had the reputation of being houses of prostitution, or
where prostitutes resorted or resided for the purpose of plying their
vocation. The appellant thereupon introduced a witness who testified,
in substance, that the reputation of said Mecca Rooms in the particulars
mentioned was good. This witness after being crossed by the State,
on redirect examination, appellant sought to have him testify that on
one occasion a girl came to his place of business and told him that she
had been put out of the Mecca Rooms because she had a date to meet a
man up there. This testimony was hearsay. The court did not err in
excluding it.

The only other matter of which appellant complains is the court's
refusal to give his two special requested charges. Neither the charges
nor the bills complaining of their refusal show that they were presented
to the judge for his action before the argument began. On that account
alone they would present no error; but the court states that one of
them was not given because given in effect in his main charge, and this

was true.   The other was wholly inapplicable and should not have been given.

The record herein presents no reversible error.   The judgment should have been affirmed, not reversed.