Billy Ray **GREEN**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 56572.

Court of Criminal Appeals of Texas, En Banc.

April 26, 1978.

Rehearing en banc Denied June 14, 1978.

Robert O. Smith, Austin, for appellant.

James L. McMurtry, County Atty. and Philip R. Lerway, Asst. County Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for public lewdness as denounced by V.T.C.A., Penal Code, Section 21.07. After a jury returned a verdict of guilty, the trial judge assessed appellant's punishment at ten days' confinement in the county jail, probated for one year, and a four hundred dollar fine.

Appellant contends that the trial judge: (1) failed to properly instruct the jury to properly apply the culpable mental state of the offense; (2) failed to apply the law to the facts in the charge to the jury; (3) admitted evidence obtained in violation of appellant's rights under the Fourth Amendment of the United States Constitution and Article 1, Section 9 of the Texas Constitution; (4) failed to give appellant's requested instruction pertaining to whether certain evidence had been illegally obtained; (5) failed to give appellant's requested instruction pertaining to whether appellant's conduct occurred in a public place; (6) failed to give appellant's requested instruction on whether appellant knew he was in a public place; (7) failed to give appellant's requested instruction on mistake of fact; (8) failed to give appellant's requested instruction pertaining to whether appellant's conduct occurred in the common area of a shop; (9) erroneously excluded defensive evidence; and (10) failed to instruct a verdict of not guilty. We overrule these contentions and affirm.

On January 18, 1977, at approximately 12:00 a. m., Sergeants Belvin, Miller, Huckabee, Polk and Ray of the Austin Police Department, and Alcoholic Beverage Commission Agent Bacak, all of whom were in plain clothes, met at Mr. Peeper's Book Store at 213 East 6th Street in Austin.

The first section of Mr. Peeper's was a typical newsstand. The second section contained soft and hard core pornographic magazines, paraphernalia, films, and a sales counter. The third section, comprising the rear portion of the building, consisted of nineteen booths, hallways and a restroom. The booths contained coin-operated viewers which, when activated by the insertion of a quarter, played portions of movies depicting various sexual acts. These booths were all approximately six and one-half feet tall, although their internal dimensions varied. Entry into each booth was through a full length, nontransparent curtain. Some of the booths had red light bulbs on top of them which were designed to go on when the viewer inside the booth was activated. The lighting in the third section of Mr. Peeper's was dim and loud music was piped in through a stereo system.

There were between fifteen and thirty-five people going into and coming out of the booths.

Sergeant Belvin saw a man, later identified as Mark Edmund Webb, enter booth No. 18. Shortly thereafter, he saw another man, later identified as the appellant, go into the same booth. Belvin motioned to Sergeants Miller and Ray and they approached Belvin who told them that two people were in the booth. Appellant came out, looked up and down the hallway and reentered the booth.

Miller and Ray then stood near the booth and each looked into it through a three to five-inch gap between the curtain and the edge of the booth. The booth was illuminated by "black lights" and the viewer in the booth had been activated. Miller saw appellant fondle Webb, unzip Webb's pants, remove his penis, and masturbate him. He then saw appellant put his head in Webb's crotch area. Ray also saw appellant's head in Webb's crotch area.

Miller, followed by Ray, then entered the booth and Miller, while holding his Austin Police Department badge in one hand and a flashlight in his other hand, announced that appellant and Webb were under arrest. At that time Miller observed Webb's penis in the appellant's mouth and saw Webb moving his hips back and forth, while Ray heard appellant sucking on Webb's penis.

Appellant and Webb were led outside by Miller and Ray. Appellant then escaped. After a chase for several blocks and through several floors in the Stephen F. Austin Hotel, the appellant was apprehended by Miller and Officer Kohler of the Austin Police Department. Kohler testified that appellant's breath "smelled like soured milk or perhaps ammonia or urine."

The appellant contends, in substance, that the court erred in failing to charge that before finding him guilty the jury must find that he knew he was in a public place and knowingly engaged in deviate sexual intercourse. The court instructed the jurors that if they believed beyond a reasonable doubt that appellant ". . . did then and there in a public place, to-wit: Mr.

Peeper's Book Store, a shop open to the public . . . knowingly engaged in deviate sexual intercourse . . . you will find the defendant guilty. . . ."

V.T.C.A., Penal Code, Section 21.07(a)(2), provides in part as follows:

"(a) A person commits an offense if he knowingly engages in any of the following acts in a public place or, if not in a public place, he is reckless about whether another is present who will be offended or alarmed by his act:

" * * *

"(2) an act of deviate sexual intercourse;"

Reading Section 21.07 as a whole, sexual deviate intercourse is illegal if it is knowingly done and if it was in a public place. The same act would be a crime in a private place if recklessly done. If the conduct reveals that those involved are reckless about whether another is present who would be offended or alarmed by that act, it is recklessly done. *See Brown v. State*, 558 S.W.2d 471 (Tex.Cr.App.1977).

We hold that knowingly as used in the statute applies only to the act of deviate sexual intercourse and not to the place where such act was committed.

The appellant's second contention is that the trial judge failed to apply the law to the facts in the charge to the jury and thereby commented on the weight of the evidence. The portion of the charge complained of is as follows:

"Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the Defendant, Billy Ray Green, on or about the 18th day of January, 1977, in the County of Travis, and State of Texas, as alleged in the information, did then and there in a public place, to-wit: Mr. Peeper's Book Store, a shop open to the public at 213 East 6th Street, Austin, Travis County, Texas, knowingly engaged in deviate sexual intercourse in that Billy Ray Green placed his mouth on the genitals of Mark Edmund Webb, you will find the

Defendant guilty of the offense of public lewdness and so say by your verdict, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict 'Not Guilty.' "

He contends that the court erred in its charge by commenting on the weight of the evidence by not limiting the jury's determination of whether appellant's conduct occurred in a public place—booth No. 18. He also requested a charge for the jury to determine if the booth was a public place.

The court instructed the jurors that if they believed beyond a reasonable doubt that appellant "as alleged in the information, did then and there in a public place, to-wit: Mr. Peeper's Book Store engaged in deviate sexual intercourse . . ." to find him guilty.

We hold that the charge was not a comment on the weight of the evidence. It required the jury to find him guilty only if they found that he committed the act as alleged. The judge did not assume any facts to be true. We also hold that the court did not err in refusing to limit the definition of a public place to booth No. 18. The information alleged in part that "Billy Ray Green did then and there in a public place, to-wit: Mr. Peeper's Book Store, a shop open to the public . . . knowingly engage in deviate sexual intercourse." All of the evidence shows that Mr. Peeper's Book Store was a public place. There was no evidence that the act was committed outside of the shop. The booth was open to anyone. All one had to do was draw the curtain to enter the booth. If one wanted to watch part of a moving picture, he could put a coin into the machine. Appellant testified that he looked into other booths and saw people in them. The store was open to the public, that is the way it was supposed to make a profit. Later in this opinion we hold that appellant had no right to expect privacy in the booth. Under all of the evidence the booth was part of a public place.

V.T.C.A., Penal Code, Section 1.07(a)(29), defines "public place" as "any place" to which the public or a substantial group of the public has access.

In *Loden v. State*, 561 S.W.2d 2 (Tex.Cr. App.1978), the defendant's probation was revoked on the ground that he appeared in a public place under the influence of alcohol to the degree that he endangered himself or others. He was arrested by an officer in the Sundance Saloon. He contended that there was no evidence to show that it was a public place. The Court noted that, although no witness testified the Sundance Saloon was a public place, the evidence showed that it was open for business on the night in question.

The proof shows that Mr. Peeper's was open for business on the night in question.

Appellant contends that the trial judge admitted evidence which was seized in violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 9 of the Texas Constitution. He argues that the testimony of Officers Miller and Ray relating to what they had seen through the crack between the curtain and the edge of the booth was the result of an unconstitutional search and seizure.

The basic purpose of the Fourth Amendment and Article 1, Section 9 is to safeguard the privacy of individuals from arbitrary invasions by *governmental* intrusions. *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Kolb v. State*, 532 S.W.2d 87 (Tex.Cr.App.1976). Thus, the Fourth Amendment and Article 1, Section 9, protect people and not places. As we stated in *Long v. State*, 532 S.W.2d 591 (Tex.Cr.App.1975),

"What a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; *Turner v. State*, 499 S.W.2d 182 (Tex.Cr. App.1973). A search means, of necessity, a quest for, a looking for, or a seeking out of that which offends against the law. This implies a prying into hidden places for that which is concealed. It is

simply not a search to observe that which is open to view. *Turner v. State,* supra; *Crowell v. State,* 147 Tex.Cr.R. 299, 180 S.W.2d 343 (1944)."

In *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr.App.1971), we were confronted with whether the defendant had a reasonable expectation of privacy in two different toilet stalls located in two different public restrooms. One of the restrooms was located inside a Sears store while the other was located in a public park. The toilet stall at the Sears store had doors which locked from the inside. The toilet stall in the public park had no doors and was visible to all in the general restroom area. Although police officers had viewed the defendant's illegal sex acts in both stalls from concealed positions above the toilet stalls, we held there that the defendant's expectation of privacy was not reasonable where no doors were provided for the stalls. There is quite a difference in one's expectation of privacy when he goes into a stall in a restroom with a door closed from the expectation of privacy in a peep show stall with the curtain open.

In *Turner v. State,* 499 S.W.2d 182 (Tex. Cr.App.1973), an officer observed illegal activity through a window that apparently had no blinds or curtains on it. We held there that no search had occurred and stated:

> "[t]hat it is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement the Fourth Amendment itself draws the blinds the occupant could have drawn but did not." *Id.* at 185.

See also *Long v. State,* 532 S.W.2d 591 (Tex.Cr.App.1975).

In *George v. State,* 509 S.W.2d 347 (Tex. Cr.App.1974), an officer, standing eighteen inches from a fence surrounding the defendant's property looked through cracks and knotholes in the fence and observed marihuana plants growing. We held there that the officer's conduct in looking through the fence was not unreasonable.

In the present case, Miller and Ray had a legal right to be in the hallway outside the booth. A three to five-inch gap between the curtain and the edge of the booth enabled the officers to view appellant's conduct. We hold that the officers' conduct did not constitute a search. Appellant testified that he walked down the hallway and opened curtains and that people were in the booths. In two of the booths homosexual activity was taking place. He also testified that the red light on top of the booth in question was not working. When on it was to show when the booth was occupied. We also hold that appellant, under the facts of this case, waived any expectation of the right to privacy. Appellant's contention is overruled.

Appellant's fourth contention is that the trial judge erred by refusing to charge the jury in accordance with appellant's requested instructions No. 7 and No. 11. Both of these requested instructions dealt with appellant's expectation of privacy and were submitted under the authority of Article 38.23, V.A.C.C.P., which states:

> "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> "In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."

Article 38.23, supra, is applicable only when an issue of fact is created by evidence of probable cause. *Merriweather v. State,* 501 S.W.2d 887 (Tex.Cr.App.1973); *McElwee v. State,* 493 S.W.2d 876 (Tex.Cr.App. 1973). Since we have held that the conduct of Miller and Ray did not constitute a search, it is clear that the trial judge properly refused appellant's requested instructions No. 7 and No. 11.

Appellant's fifth contention is that the trial judge erred by refusing to charge the jury in accordance with appellant's requested instruction No. 2, which states:

"If you find from the evidence, or if you have a reasonable doubt thereof, that booth No. 18 in Mr. Peeper's Book Store at 213 E. 6th Street, as shown by the evidence, was not a "Public Place" as that term has been defined herein, then you shall acquit the Defendant and say by your verdict 'Not Guilty.'"

■ When any defensive theory is raised by the evidence, the trial judge must charge the jury on that defensive theory. The denial of a defendant's requested instruction is not error where the requested instruction is merely an affirmative submission of a defensive issue which merely denies the existence of an essential element of the State's case. *Bearden v. State,* 487 S.W.2d 739 (Tex.Cr.App.1972); *Kirkland v. State,* 162 Tex.Cr.R. 424, 285 S.W.2d 743 (1955); *Gilmore v. State,* 158 Tex.Cr.R. 534, 257 S.W.2d 300 (1953). For this reason, the judge in this case properly refused to give the requested instruction.

■ The sixth ground of error is that the trial judge erred by failing to charge the jury in accordance with appellant's requested instruction No. 4, which states:

"You are instructed that before you can convict the Defendant of knowingly committing an act of deviate sexual intercourse in a public place as alleged in the information, you must find and believe from the evidence beyond a reasonable doubt that at the very time he engaged in the act of deviate sexual intercourse, if you have found beyond a reasonable doubt that he did, he knew he was in a public place as that term has been defined herein, and if you have a reasonable doubt that the Defendant had knowledge that he was in a public place then you will acquit the Defendant and say by your verdict 'Not Guilty.'"

We have previously overruled appellant's initial ground of error in which he contended that the culpable mental state—knowingly—applies to the public place require-

ment of V.T.C.A., Penal Code, Section 21.07. We therefore conclude that no error is shown.

The seventh ground of error is that the judge erred by failing to charge the jury in accordance with appellant's requested instruction No. 6, which dealt with the defense of mistake of fact.

V.T.C.A., Penal Code, Section 8.02, states:

"(a) It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required by commission of the offense.

"(b) Although an actor's mistake of fact may constitute a defense to the offense charged, he may nevertheless be convicted of any lesser included offense of which he would be guilty if the fact were as he believed."

The defense of mistake of fact is a defense only if "his mistaken belief negated the kind of culpability required for commission of the offense" and only where that mistake has led to a reasonable belief concerning that fact. Appellant contends that there was evidence that he was reasonably mistaken as to whether the booth was a public place. However, we have previously overruled appellant's initial ground of error in which he contended knowingly is a part of the public place requirement of V.T.C.A., Penal Code, Section 21.07. Even if appellant did form, through mistake, a belief that the booth was not a public place, such mistake of fact could not be a defense since there is no requirement that a defendant know that the location where the act was performed was a public place.

■ In the eighth ground of error it is contended that the judge erred in failing to charge the jury in accordance with appellant's requested instruction that the jury must find he was in the common area of Mr. Peeper's shop before finding him guilty.

The judge's charge contained an instruction which included " . . . Mr. Peeper's Book Store, a shop open to the public. . . ." This tracked the allegations in the information.

Appellant contends that the reference to "shop," plus the evidence adduced at trial, created a fact issue which justified appellant's requested instruction No. 5.

V.T.C.A., Penal Code, Section 1.07(a)(29), supra, defines public place to mean any place to which the public or a substantial group of the public has access, and then sets forth a non-exhaustive list of examples of what constitutes a public place. Common areas of shops constitute but one example of a public place. Other areas of shops which are not "common areas" could be public places. Thus, an accused could be convicted of public lewdness even if the illegal act was performed in a "shop" but the exact location of the act was not in a "common" area of that "shop." Therefore, appellant's requested instruction was properly denied. Cf. Mutscher v. State, 514 S.W.2d 905, 926 (Tex.Cr.App.1974).

The ninth contention concerns the trial judge's exclusion of defensive testimony. Specifically, appellant contends that certain portions of his own testimony as well as certain portions of the testimony of Paul Bankston and Marsha Head should not have been excluded by the trial judge.

He argues that the defensive evidence tended to establish that the lighting in the third section of Mr. Peeper's was so dim that, given the floor plan of booth No. 18, it would have been impossible for Miller and Ray to have seen any activity in the booth. Furthermore, the music was of such a volume that no "sucking noises", as testified to by Ray, could have been heard.

The defense then sought to prove some type of conspiracy against appellant, who at the time of his arrest was the District Attorney in the Third Judicial District of Texas. Appellant testified before the jury that he became an Assistant County Attorney for Anderson County in June, 1974. He was, at that time, assistant to County Attorney Bill House who had been appointed to fill an unexpired term. In September, 1974, House fired appellant. At the time appellant was fired, he related that he was engaged in an investigation of "narcotic payoffs" within the Palestine Police De-partment. Appellant had approached House about the matter, and when House responded that he did not want to know anything about it, appellant discussed the matter with Mr. Handorf, then District Attorney for the Third Judicial District in Anderson County, and Mr. Whitaker, then District Attorney for the 173rd Judicial District in Anderson County. According to appellant, the Federal Bureau of Investigation was apprised of the matter. Immediately thereafter, appellant was fired without any reason or justification.

Appellant ran as a write-in candidate against House for County Attorney in November, 1974. Appellant won the election and immediately advised House that, due to House's noncompliance with the election laws, House would have to resign immediately. House resigned and appellant became County Attorney in November, 1974.

Appellant's term as County Attorney ended on December 31, 1976. Prior to the expiration of his term, appellant decided to run for District Attorney of the Third Judicial District. He ran against the incumbent District Attorney Richard Handorf in November, 1976. Handorf's campaign was handled by one Danny Parish, who was allegedly assisted by Michael O'Brian, District Attorney Handorf's sole criminal investigator. Handorf's campaign allegedly involved "smear" tactics, including the dissemination of rumors that appellant had been arrested for driving while intoxicated on two occasions, and posters, containing "mug" shots from the Palestine Police Department's files depicting appellant as a "nigger hater." Appellant won the election but thereafter was under the belief that O'Brian had him under surveillance. Appellant wanted to testify before the jury that O'Brian told him that he was under surveillance.

Appellant then testified before the jury about his activity on January 17 and 18, 1977. Appellant drove to Austin on January 17, 1977, to order stationery for his office. He also related that in December, 1976, Kenneth Berry, the Chief of Police in Palestine, had brought him an eight-track

tape to ascertain whether appellant, as County Attorney for Anderson County which included Palestine, could determine if the tape was obscene. On January 11, 1977, appellant and Berry had another conversation pertaining to obscenity and the local community standards in Palestine. Due to these conversations, he decided to investigate the obscenity standards while he was in Austin.

Therefore, at approximately 10:30 p. m., on January 17, 1977, he left an apartment in Austin and went to the "All American Newsstand" on Guadalupe Street. He looked at soft and hard core pornographic magazines and viewed one "peep show." At approximately 11:30 p. m., appellant went to Mr. Peeper's, which he had noticed earlier during the day. He looked at the soft and hard core pornographic literature in the second section of Mr. Peeper's and then went into the third or "peep show" section of Mr. Peeper's. He viewed a number of different films and went into approximately six different booths. In some of the booths he encountered people, and some of these people were engaged in various sexual acts.

He saw a sign outside the booth in question which read: "Protect your rights; when you insert 25 cents, you're renting this space." When he went into the booth, the red light bulb on top of the booth was not on. However, once inside the booth he encountered Mark Webb, whom he had never previously met. The movie then in progress stopped and appellant bent over to insert a quarter into the viewer. At that time, Miller and Ray entered the booth and arrested him and Webb. Appellant testified that he could not see Miller's badge and that he thought he was "getting taken for a ride." He denied that he had engaged in any illegal activity while in the booth.

Appellant also introduced evidence before the jury that after his arrest Texas Ranger Bob Prince, who was stationed in Palestine, obtained copies of offense reports prepared by members of the Austin Police Department and distributed copies to the Judge of the Third Judicial District in Palestine,

Chief Berry of the Palestine Police Department, and Prince's chief in Waco. Furthermore, copies of the offense reports were found on the desk of the Judge of the 87th Judicial District and in the parking lot of the Calhoun Packing Company in Palestine.

As set out above, the defensive evidence was voluminous. He attempted to show that he had not engaged in any illegal conduct in the booth and that Richard Handorf, Danny Parish, Michael O'Brian and others had conspired to "get" him due to his successful bid for District Attorney in the 1976 election.

Appellant testified that posters had been disseminated during the 1976 Democratic Primary. These posters contained, among other things, "mug" shots of two men, one white and one black, whom appellant had prosecuted during his tenure as County Attorney. The posters attempted to show that appellant was prejudiced against blacks. He also testified that the "mug" shots had been given to Mike O'Brian by Sergeant Yarbor of the Palestine Police Department. When he attempted to testify about two alleged conversations with O'Brian, the prosecutor objected on the ground that the testimony would be hearsay. The court sustained the objection.

He then made an offer of proof that O'Brian told him that he had gotten the "mug" shots used on the posters and that he had delivered the "mug" shots to one of Danny Parish's employees. Appellant also testified outside the presence of the jury that after the election O'Brian told appellant that he was going to "ruin" appellant and that he had the appellant under surveillance. Appellant then testified to facts which tended to support his defensive theory that even during his trial he was under surveillance by "certain law enforcement authorities." The appellant stayed with a friend and did not tell anyone where he was going to spend the night. However, he was located at his friend's residence at approximately 11:30 p. m. by Texas Ranger Rundell, who served appellant with a subpoena.

The State explained that this friend of appellant's was the one he called after he

was arrested on the night of the offense and the officers knew who he had called.

Appellant also called Marsha Head, wife of Representative Fred Head of the 14th Legislative District, to testify. Mrs. Head attempted to testify to a conversation she had with Danny Parish immediately prior to the 1976 Democratic Primary, but the trial judge excluded the conversation as hearsay. Appellant made an offer of proof which tended to show that Parish was involved in the preparation and dissemination of posters immediately prior to the 1976 Democratic Primary. Neither O'Brian nor Parish was called to testify.

Appellant also called Paul Bankston to testify about conversations he had with Danny Parish prior to the 1976 Democratic Primary. When the judge excluded the testimony concerning the conversations, an offer of proof of Bankston's testimony was made outside the presence of the jury. According to Bankston, Parish came to Bankston's store in Malakoff a week prior to the election and asked Bankston what percentage of Malakoff was populated with blacks and which sections of Henderson County were most heavily populated with blacks. When Bankston asked why Parish wanted to know that information, Parish responded that he was handling Mr. Handorf's campaign.

Apparently appellant is contending that this conspiracy to "get him" was entered into by the officers who arrested him. The Austin officers testified before the jury that they did not know and had not heard of appellant prior to his arrest. Ranger Prince, who was stationed in the Palestine area, testified that he was in Austin on other business and he did not know that appellant was in Austin on the date of the offense.

Irrelevant proof of threats made during a political campaign could have had no legitimate bearing on this trial. The officers testified that they did not know appellant and had no dealings with him directly or indirectly. Apparently appellant's conspiracy theory would be that he did not commit the deviate sexual intercourse and that the officers framed him and committed perjury to convict him.

Ranger Prince's presence in Austin on the day in question does not tend to prove a conspiracy. Agent Bacak had worked in a large area of East Texas before being transferred to Austin; this fact does not tend to support a conspiracy.

The court permitted appellant an opportunity outside the presence of the jury to show bias and to discredit the officers. Since he could show no conspiracy, the offered evidence was excluded.

In *Timmins v. State,* 82 Tex.Cr.R. 263, 199 S.W. 1106, 1108, an attempt was made to introduce hearsay testimony to show that a prosecutor offered to dismiss an action against Reese, a witness, if he would testify against Timmins. This Court held that any agreement on the subject would have been proper to use to impeach Reese but that the necessary predicate was not laid by inquiry of Reese with reference to any agreement with the district attorney. In the present case the State proved there was no agreement or conspiracy. Appellant did not cross-examine the officers who testified against him about any conspiracy. He did not call O'Brian or Parish to lay the basis for proving a conspiracy. *See* 87 A.L.R.2d, Discrediting Witnesses, Section 7, Texas Rule, page 426, where it is written:

"It has generally been held or expressly recognized that a foundation must be laid for independent evidence of an adverse witness' bias or prejudice where such evidence is based upon the witness' statements or utterances. *Nite v. State* (1899) 41 Tex.Crim. 340, 54 S.W. 763; *Burnaman v. State* (1913) 70 Tex.Crim. 361, 159 S.W. 244, 46 LRA,NS, 1001; *Echols v. State* (1914) 75 Tex.Crim. 369, 170 S.W. 786, overruled on other grounds in *Hall v. State* (1928) 111 Tex.Crim. 381, 12 S.W.2d 1024; *Timmins v. State* (1917) 82 Tex. Crim. 263, 199 S.W. 1106; *Bell v. State* (1919) 85 Tex.Crim. 475, 213 S.W. 647; *Hennington v. State* (1924) 101 Tex.Crim. 12, 274 S.W. 599; *Lanhan [Lanham] v. State* (1925) 99 Tex.Crim. 410, 269 S.W. 799; *Hopper v. State* (1925) 102 Tex. Crim. 313, 277 S.W. 636."

*Cf. Cockrell v. State,* 60 Tex.Cr.R. 124, 131 S.W. 221 (1910), a case apparently to the contrary.

 The rule is comparable to the one for impeaching a witness with a prior inconsistent statement. To lay a proper predicate for impeachment the witnesses should be asked about any agreement or conspiracy before there is an attempt to prove one.

 Hearsay is inadmissible for impeachment purposes. See *Taylor v. State,* 160 Tex.Cr.R. 124, 267 S.W.2d 828 (1954); *Adams v. State,* 110 Tex.Cr.R. 20, 7 S.W.2d 528, 530. Appellant's purpose was to impeach the witnesses. Hearsay evidence has no more probative value for impeachment purposes than it does in proving the facts of a case. In the present case, if we accepted the offered hearsay testimony as true, it still does not show a conspiracy.

If the evidence were held to be proper in this case, imagine a defendant who has had many bitter political campaigns. All of the testimony about people out to get him in those campaigns could be aired before the jury. Such evidence would seldom be relevant. It would prolong trials for no purpose at all. *See Duncantell v. State,* 563 S.W.2d 252 (Tex.Cr.App.1978).

 The final contention is that the trial judge erred by refusing to grant the motion for an instructed verdict on the ground that there was a fatal variance between the information and the proof. He contends that since the information alleged that the offense was committed in "a shop" there should have been evidence that Mr. Peeper's was a shop.

There was sufficient evidence for the jury to have concluded that Mr. Peeper's

was a shop. No witness referred to Mr. Peeper's as a shop, but the evidence shows that the place was open for business. Items were for sale. It was referred to as a store. *Cf. Baughman v. State,* 49 Tex.Cr.R. 33, 90 S.W. 166 (1905), and *Jones v. State,* 81 Tex.Cr.R. 230, 194 S.W. 1109 (1917).

 The evidence supports the verdict and the court did not err by refusing to grant the motion for an instructed verdict.

There being no reversible error, the judgment is affirmed.

VOLLERS, J., not participating.

ROBERTS, Judge, dissenting.

I cannot agree that the majority has correctly decided the appellant's second, fifth and ninth grounds of error. I shall first address the appellant's ninth contention, and thereafter I shall address his second and fifth contentions in conjunction with one another.

I.

The appellant's ninth contention concerns the trial judge's exclusion of defensive testimony. Before I consider this contention, however, it is necessary to fully review all the evidence contained in the record.

The trial testimony reveals that on January 18, 1977, at approximately 12:00 a. m., Sergeants Belvin, Miller, Huckabee, Polk and Ray of the Austin Police Department, and Alcoholic Beverage Commission Agent Bacak met at Mr. Peeper's Book Store at 213 E. 6th Street in Austin. The six officers, all of whom were in plain clothes, entered Mr. Peeper's.

They discovered that Mr. Peeper's was divided into three sections.[1] The first sec-

---

1. My examination of the record and the exhibits introduced by both the State and the appellant leads me to believe that Mr. Peeper's was divided into three distinct sections. However, the appellant's brief contends that Mr. Peeper's was comprised of only two sections. Although both the State and the appellant offered an exhibit depicting the floor plan of Mr. Peeper's, neither exhibit, or, for that matter, the references in the record to those exhibits, identifies

with any degree of specificity the respective sections of Mr. Peeper's. If either the State or the appellant had placed letters, numbers or other identifying features on the various locations depicted in their exhibits and referred to such identifying features when they questioned witnesses about those particular locations, the record would be much clearer and this Court's disposition of this matter would have been greatly facilitated. I cannot overemphasize the

tion, which is immediately adjacent to the main entrance, was a typical newsstand. The second section, which was located to the rear of the first section, contained soft and hard core pornographic magazines, paraphernalia, films, and a sales counter. The third section, which comprised the rear portion of the building and entry to which was through a doorway covered by a curtain, consisted of nineteen booths, hallways, and a restroom. The booths contained coin-operated viewers which, when activated by the insertion of a quarter, played portions of movies depicting various sexual acts. These booths were all approximately six and one-half feet tall, although their internal dimensions varied. Entry into each booth was through a full length, nontransparent curtain. Some of the booths had red light bulbs on top of them which were designed to go on when the viewer inside the booth was activated. The lighting in the third section of Mr. Peeper's was dim and loud music was piped in through a stereo system.

When the officers entered the third section of Mr. Peeper's they separated and investigated the area. The total number of people in this section of Mr. Peeper's was between fifteen and thirty-five, and people were going into and out of the booths.

Sergeant Belvin saw a man, subsequently identified as Mark Edmund Webb, enter booth # 18. Shortly thereafter, he saw a man, subsequently identified as the appellant, likewise go into booth # 18. Belvin motioned to Sergeants Miller and Ray, and they approached Belvin who told them that two people were in booth # 18. The appellant then came out of booth # 18, looked up and down the hallway, and then reentered booth # 18.

importance of a clear and unambiguous record in the appellate process. However, my disposition of this cause does not depend upon whether there were two or three separate sections, for it is clear that the offense was committed in the section which contained booths with viewers in them.

Miller and Ray then positioned themselves outside booth # 18 and each looked into booth # 18 through a three to five-inch gap between the curtain and the edge of the booth. The booth was illuminated not only by the "black lights" in the third section of Mr. Peeper's, but also by the viewer in booth # 18 which, at the time Miller and Ray were looking into booth # 18, had been activated. Miller saw the appellant fondle Webb, unzip Webb's pants, remove Webb's penis, and masturbate Webb's penis. He then saw the appellant put his head in Webb's crotch area. Ray also saw the appellant's head in Webb's crotch area.

Miller, followed by Ray, then entered booth # 18 and Miller, while holding his Austin Police Department badge in one hand and a flashlight in his other hand, announced that the appellant and Webb were under arrest. At that time, Miller observed Webb's penis in the appellant's mouth and saw Webb moving his hips back and forth, while Ray heard the appellant sucking on Webb's penis.

The appellant and Webb were subsequently led outside by Miller and Ray. After the appellant had been led to an unmarked police car, he escaped. The appellant was apprehended shortly thereafter in the Stephen F. Austin Hotel by Miller and Officer Kohler of the Austin Police Department. Kohler testified that the appellant's breath "smelled like soured milk or perhaps ammonia or urine."

The defensive evidence tended to establish that the lighting in the third section of Mr. Peeper's was so dim that, given the floor plan of booth # 18,[2] it would have been impossible for Miller and Ray to have seen any activity in the booth. Furthermore, the music was of such a volume that

2. The evidence revealed that booth # 18 was 52″ by 42″. The movie viewer occupied a portion of that floor space. The opening through which entry into booth # 18 could be had was 18″ wide, and it was partially covered by a 44″ curtain. The gap between the edge of the curtain and the edge of the booth was larger near the floor than near the top of the booth.

no "sucking noises," as testified to by Ray, could have been heard.

The defense also introduced evidence of a conspiracy against the appellant.[3] The appellant testified that he became an Assistant County Attorney for Anderson County in June 1974. He was, at that time, assistant to County Attorney Bill House who had been appointed to fill an unexpired term. In September 1974, House fired the appellant.[4]

The appellant ran as a write-in candidate against House for County Attorney in November 1974. The appellant won the election and immediately advised House that due to House's noncompliance with the election laws, House would have to resign immediately. House resigned and the appellant became County Attorney in November 1974.

The appellant's term as County Attorney ended on December 31, 1976. Prior to the expiration of his term, the appellant decided to run for District Attorney of the 3rd Judicial District. He ran against the incumbent District Attorney Richard Handorf in November 1976. Handorf's campaign was handled by one Danny Parish, who was allegedly assisted by Michael O'Brian, District Attorney Handorf's sole criminal investigator. Handorf's campaign allegedly involved "smear" tactics, including the dissemination of rumors that the appellant had been arrested for driving while intoxicated on two occasions, and posters, containing "mug" shots from the Palestine Police Department's files depicting the appellant as a "nigger hater." The appellant won the election but thereafter was under the belief that O'Brian had him under surveillance.[5]

The appellant then testified about his activity on January 17 and 18, 1977. The appellant drove to Austin on January 17, 1977, to order stationery for the 3rd District. However, appellant testified that in December 1976, Kenneth Berry, the Chief of Police in Palestine, had brought him an eight-track tape to ascertain whether the appellant, as County Attorney for Anderson County which included Palestine, could determine if the tape was obscene.[6] On January 11, 1977, the appellant and Berry had another conversation pertaining to obscenity and the local community standards in Palestine. Due to these conversations, the appellant decided to investigate the obscenity standards while he was in Austin.

Therefore, at approximately 10:30 p. m., on January 17, 1977, the appellant left the apartment where he was staying while in Austin and went to the "All American Newsstand" on Guadalupe. He looked at soft and hard core pornographic magazines and viewed one "peep show." At approximately 11:30 p. m., the appellant went to Mr. Peeper's, which he had noticed earlier during the day. The appellant looked at the soft and hard core pornographic literature in the second section of Mr. Peeper's, and then went into the third or "peep show" section of Mr. Peeper's. The appellant viewed a number of different films and went into approximately six different booths. In some of the booths he encountered people, and some of these people were engaged in various sexual acts.

---

3. The appellant, at the time of his arrest, was the District Attorney for the 3rd Judicial District in Anderson County.

4. At the time the appellant was fired, he was engaged in an investigation of "narcotic pay-offs" within the Palestine Police Department. The appellant had approached House about the matter, and when House responded that he did not want to know anything about it, the appellant discussed the matter with Mr. Handorf, then District Attorney for the 3rd Judicial District in Anderson County, and Mr. Whitaker, then District Attorney for the 173rd Judicial District in Anderson County. According to the appellant, the Federal Bureau of Investigation was apprised of the matter. Immediately thereafter, the appellant was fired without any reason or justification from House.

5. The appellant attempted to substantiate this belief by testifying to a post-election conversation he had with O'Brian. The trial judge excluded the conversation and the exclusion of this evidence is discussed below.

6. Berry testified that he did not know whether the tape was obscene.

The appellant saw a sign outside booth # 18 which read "Protect your rights; when you insert 25 cents, you're renting this space." When the appellant went into booth # 18, the red light bulb on top of the booth was not on. However, once inside booth # 18, he encountered Mark Webb, whom he had never previously met. The movie then in progress stopped and the appellant bent over to insert a quarter into the viewer. At that time, Miller and Ray entered the booth and arrested him and Webb. The appellant testified that he could not see Miller's badge and that he thought he was "getting taken for a ride." The appellant denied that he had engaged in any illegal activity while in booth # 18.

The appellant also introduced evidence that after his arrest Texas Ranger Bob Prince, who was stationed in Palestine, obtained copies of offense reports prepared by members of the Austin Police Department and distributed copies to Judge Lawrence of the 3rd Judicial District in Palestine, Chief Berry of the Palestine Police Department, and Prince's chief in Waco. Furthermore, copies of the offense reports were found on the desk of Judge Tate McCain, of the 87th Judicial District in Palestine, and in the parking lot of the Calhoun Packing Company in Palestine.

To reiterate, the appellant's ninth contention concerns the trial judge's exclusion of defensive testimony. Specifically, the appellant contends that certain portions of his own testimony as well as certain portions of the testimony of Paul Bankston and Marsha Head should not have been excluded by the trial judge.

As set out above, the defensive evidence was voluminous. The appellant attempted to show that he had not engaged in any illegal conduct in booth # 18 and that Richard Handorf, Danny Parish, Michael O'Bri-

an and others had conspired to "get" the appellant due to the appellant's successful bid for District Attorney in the 1976 election.

The appellant testified that posters had been disseminated during the 1976 Democratic Primary. These posters contained *inter alia*, "mug" shots of two men, one white and one black, whom the appellant had prosecuted during his tenure as County Attorney. The posters attempted to show that the appellant was prejudiced against blacks. The appellant also testified that the "mug" shots had been given to Mike O'Brian by Sergeant Yarbor of the Palestine Police Department. The appellant then attempted to testify about two conversations he had with O'Brian, but the prosecutor objected on the ground that the testimony would be hearsay. The appellant responded that the conversations fell within the conspiracy exception to the hearsay rule, but the trial judge sustained the prosecutor's objection.

The appellant then made a proffer of proof. The appellant's proffer of proof established that O'Brian told the appellant that he had gotten the "mug" shots used on the posters and that he had delivered the "mug" shots to one of Danny Parish's employees. The appellant also testified outside the presence of the jury that after the election O'Brian told the appellant that he was going to "ruin" the appellant and that he had the appellant under surveillance. O'Brian also gave the appellant specific facts which revealed to the appellant that O'Brian did in fact have the appellant under surveillance. The appellant then testified to facts which tended to support his defensive theory that even during his trial he was under surveillance by "certain law enforcement authorities." [7]

---

7. The appellant based his belief on the fact that on the night prior to his trial the appellant stayed with a friend. The appellant did not tell anyone where he was going to spend the night. However, he was located at his friend's residence at approximately 11:30 p. m. by Texas Ranger Pappy Rundell, who served the appellant with a subpoena. The majority's statement that "The State explained that this friend

of appellant's was the one he called after he was arrested on the night of the offense and the officers knew who he had called" is factually inaccurate and misleading. The prosecutor cross-examined the appellant and *only* established that the appellant on the night of his arrest, made a phone call to an attorney named Damron from the city jail. The prosecutor then asked the appellant if Damron's number

The appellant also called Marsha Head, wife of Representative Fred Head of the 14th Legislative District, to testify. Mrs. Head attempted to testify to a conversation she had with Danny Parish immediately prior to the 1976 Democratic Primary, but the trial judge excluded the conversation as hearsay. The appellant made a proffer of proof which tended to show that Parish was involved in the preparation and dissemination of posters immediately prior to the 1976 Democratic Primary.

The appellant also called Paul Bankston to testify. Bankston attempted to testify to conversations he had with Danny Parish prior to the 1976 Democratic Primary. When the trial judge excluded Bankston's testimony concerning the conversations, the appellant made a proffer of proof in the form of Bankston's testimony outside the presence of the jury. According to Bankston, Parish came to Bankston's store in Malakoff a week prior to the election and asked Bankston what percentage of Malakoff was populated with blacks and which sections of Henderson County were most heavily populated with blacks. When Bankston asked why Parish wanted to know that information, Parish responded that he was handling Mr. Handorf's campaign.

Bankston also testified that on the day of the 1976 Democratic Primary Parish entered his store and "said he thought that he had everything set up and that he'd been handing out handbills until 5:00 o'clock that morning."

Thus, it is apparent that the excluded evidence *tended* to support the defensive theory that Handorf, O'Brian, Parish and others were conspiring to "get" the appellant. I have concluded that the trial judge's exclusion of this testimony constituted reversible error and that the majori-ty's disposition of this ground of error effectively eliminates the issue from the jury's consideration.

Initially, it should be pointed out that the excluded evidence was admissible as the appellant's *defensive evidence* explaining the events surrounding and encompassing the alleged crime. This evidence was also admissible as *evidence* tending to *impeach* the testimony of the officers who arrested the appellant. The majority's statement that the "[a]ppellant's purpose [by attempting to introduce the excluded evidence] was to impeach the witnesses" [Officers Miller and Ray], ante at 588, reveals that the majority fails to comprehend the dual basis for the admissibility of the evidence.

As to the first basis of the admissibility of the excluded evidence—that the evidence was defensive evidence—the majority opinion is completely silent, and understandably so. I can think of no necessity to lay a *predicate* for the introduction of purely defensive testimony.

Moreover, it is well established that the co-conspirator exception to the hearsay rule is "a rule of evidence applicable to the prosecution of any offense in which co-conspirators participate." *Rodriquez v. State,* 552 S.W.2d 451, 454 (Tex.Cr.App.1977). It is equally well established that the order of proof is not material; proof of a defendant's participation in, and the existence of, a conspiracy need not be made before hearsay statements and acts of a co-conspirator are admissible. *Rodriquez v. State,* supra; *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr. App.1974). Moreover, each statement or act of a co-conspirator up until the time that the object or objects of the conspiracy are completed is admissible. *Helms v. State,* 493 S.W.2d 227 (Tex.Cr.App.1973). Since it is well established that "[a] good

had been entered on the police card recording the appellant's property when he made the call, but the appellant answered that he didn't know whether it had been. The prosecutor then asked the appellant if he was aware that phone numbers could be "crisscrossed" with addresses, and the appellant responded that he was not aware of exactly what this procedure was. However, the prosecutor *never* established that the phone number of the friend the appellant called on the night of the appellant's arrest had been recorded by the police on the night the appellant was arrested, that Ranger Rundell or other officers were aware of that fact, or that Rundell or other officers did in fact crisscross the number to obtain the address of the appellant's friend. The majority assertion is simply incorrect.

rule of evidence works both ways," *Montemayor v. State,* 543 S.W.2d 93, 99 (Tex.Cr. App.1976) (Opinion on State's Motion for Rehearing, Douglas, J., Dissenting), the co-conspirator exception to the hearsay rule is applicable to situations, like the present, where a defendant's defensive theory involves a conspiracy.

Applying the foregoing principles to the trial judge's exclusion of the testimony of Marsha Head and Paul Bankston, it is clear that all of their excluded testimony related to statements made by Danny Parish. The excluded statements were in reference to Handorf's election. The appellant's defense of conspiracy was built upon the political revenge that Handorf and his cohorts sought as a result of the hotly contested 1976 Democratic Primary.

Moreover, the exclusion of Head's and Bankston's testimony must be considered in conjunction with the exclusion of the appellant's testimony. The appellant's proffer of proof related to O'Brian's statement that he was going to "ruin" the appellant. This statement was made after the 1976 Democratic Primary, only two months prior to the commission of the alleged offense. It expressed the idea that Handorf, who prior to the election had employed O'Brian as a criminal investigator, would seek revenge due to the appellant's victory in the election. Also, the exclusion of O'Brian's statement to the appellant that O'Brian had the appellant under surveillance was relevant to the appellant's defense of conspiracy.

The excluded testimony all related to statements of Parish and O'Brian. Both Parish and O'Brian worked for Handorf. I am constrained to conclude that the trial judge improperly excluded the testimony of Head, Bankston and the appellant.[8]

As to the second basis of the admissibility of the excluded evidence—that the evidence was impeachment evidence—the majority constructs a requirement that a proper predicate be laid.

Initially, I note that the defense attempted to prove that there was a conspiracy among certain persons to "get" the appellant. The excluded evidence, which the majority labels "[i]rrelevant proof of threats made during a political campaign," when taken together with the evidence introduced by the appellant, was sufficient to create an inference that the officers who arrested the appellant were connected with the conspiracy.[9] However, there was no direct evidence to demonstrate that the conspiracy among Handorf, O'Brian and Parish, if any, was connected with the appellant's arrest in Austin by Officers Miller and Ray. The appellant could only attempt to prove such a connection, if any, by introducing circumstantial evidence which might tend to prove the alleged connection. Any such connection would logically tend to impeach and rebut the testimony of Miller and Ray.

In *Bailey v. State,* 532 S.W.2d 316, 319 (Tex.Cr.App.1975), we stated that "[w]here a case, such as the one before us, is dependent on circumstantial evidence for its proof,

---

**8.** In so concluding, I expressly reject the State's assertion that the appellant failed to link the conspiracy in Palestine with the Austin Police. The excluded testimony supported the defensive theory of a conspiracy among Handorf, Parish and O'Brian. However, the excluded testimony also established that O'Brian had the appellant under surveillance and that O'Brian would "ruin" the appellant. Also, the excluded testimony tended to show that the appellant was under surveillance by the law enforcement authorities prior to and during his trial in Austin.

The record also reveals that a member of the Austin Police Department gave Ranger Bob Prince, who was stationed in Palestine, copies of the offense reports prepared by members of

the Austin Police Department. Copies of these offense reports were distributed to various people in Palestine. None of the five Austin Police Department officers or ABC Agent Bacak had been assigned to enforce sexual offenses, and Mr. Peeper's did not serve or sell alcoholic beverages so as to justify and explain Bacak's presence there. Finally, from July 1974 until December 1974 Agent Bacak had been responsible for ABC enforcement in the Palestine area.

I believe that the evidence was sufficient to circumstantially link the alleged conspiracy in Palestine with the police who arrested the appellant.

**9.** See note 8, supra.

the rules of evidence will not be so stringently applied so as to exclude evidence *which sheds light on the occurrence.*" (Emphasis added). This rule applies equally to defensive testimony.

Moreover, in *Coleman v. State,* 545 S.W.2d 831 (Tex.Cr.App.1977), we dealt with the exclusion of defensive testimony which tended to show that police officers, who the defendant contended had "framed" him, were antagonistic toward the defendant. We there stated:

> "The animus, motive, or ill-will of a prosecuting witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant may show by himself, or by others if necessary, why the witness is unfriendly toward him. *Kissinger v. State,* 126 Tex. Cr.R. 182, 70 S.W.2d 740, 742 (1934). *It is not necessary that a predicate be laid that the witness himself is biased toward the defendant before evidence which would create this bias is introduced. Smith v. State,* 106 Tex.Cr.R. 202, 291 S.W. 544, 545 (1927). The reasoning behind this rule is simply that great latitude should be allowed the accused in showing any fact which would tend to establish ill feeling, bias, motive and animus upon the part of any witness testifying against him. The jury should be given the opportunity to judge for themselves the witness's credibility in light of his feelings toward the defendant. *Wood v. State,* 486 S.W.2d 359, 362 (Tex.Cr.App.1972); *Minor v. State,* 476 S.W.2d 694, 695 (Tex. Cr.App.1972)." (Emphasis added). *Id.* at 833.

As in *Coleman,* the evidence which was excluded could have been used by the defense to suggest to the jury that the arresting officers were biased. The evidence should not have been excluded by the trial judge.[10]

The majority has apparently seen fit to ignore and/or overrule *sub silentio* the rule quoted above from *Coleman.*

Moreover, it is clear that a proper predicate was laid for the excluded evidence which was offered to impeach the arresting officers' version of the appellant's activity on the night in question. The appellant cross-examined the officers about their purpose for being in Mr. Peeper's and their knowledge of the appellant. When the officers testified concerning the appellant's alleged activities, and when the officers denied knowing or ever seeing the appellant prior to the night of the appellant's arrest, they inferentially denied the existence of any conspiracy and thus a proper predicate was laid to impeach them.

It is clear that the majority simply does not believe the appellant's conspiracy theory. Statements by the majority, such as "[i]rrelevant proof of threats made during a political campaign could have no legitimate bearing on this trial," and "[s]uch evidence would seldom be relevant. It would prolong trials for no purpose at all," indicate that the majority is substituting its opinion of the merits of the appellant's defensive theory for the jury. This I cannot condone. The appellant had a right to present the excluded evidence to the jury. The trial judge's exclusion of the evidence was reversible error.

## II.

The appellant's second contention is that the trial judge failed to apply the law to the facts in the charge to the jury and thereby commented on the weight of the evidence. The portion of the charge complained of is as follows:

> "Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the Defendant, Billy Ray Green, on or about the 18th day of January, 1977, in the County of Travis, and State of Texas, as alleged in the information, did then and there in a public place, to-wit: Mr. Peeper's Book Store, a shop open to the public

10. *Cf. Baughman v. State,* 49 Tex.Cr.R. 33, 90 S.W. 166 (1905) and *Jones v. State,* 81 Tex. Cr.R. 230, 194 S.W. 1109 (1917).

at 213 East 6th Street, Austin, Travis County, Texas, knowingly engaged in deviate sexual intercourse in that Billy Ray Green placed his mouth on the genitals of Mark Edmund Webb, you will find the Defendant guilty of the offense of public lewdness and so say by your verdict, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict 'Not Guilty'."

The appellant specifically objected to this portion of the charge on the basis that it constituted a comment on the weight of the evidence and that it failed to limit the jury's determination of whether the appellant's conduct occurred in a public place to the exact location—booth # 18—where that conduct in fact occurred. The appellant also submitted a requested charge dealing with booth # 18 and whether booth # 18 was a public place [see discussion below of appellant's fifth ground of error].

While I agree with the majority's conclusion that the charge did not constitute a comment on the weight of the evidence, I violently disagree with the majority's conclusion "that the court did not err in refusing to limit the definition of a public place to booth No. 18." Ante at 582.

The majority's disposition of this ground of error is predicated, at least in part, upon the fact that the appellant had "no right to expect privacy in the booth." Ante at 582. I agree that the appellant waived any expectation of privacy while he was in booth # 18 due to the crack between the edge of the booth and the curtain. However, the concepts of "reasonable expectation of privacy" and "public place," although related, are distinct and not interdependent.

The following examples will demonstrate that it is possible to commit an act of public lewdness in: (1) a public place with a reasonable expectation of privacy; (2) a public place without a reasonable expectation of privacy; (3) a private place with a reasonable expectation of privacy; or (4) a private place without a reasonable expectation of privacy. The examples will also demonstrate that the "public" or "private" nature of the location is not transformed from one to another depending upon whether a person has a reasonable expectation of privacy.

The first example involves a toilet stall in a Sears store and a toilet stall in a public park. The former has a door that locks from the inside, while the latter has no doors. Both stalls are accessible to the public or a substantial group of the public. Accordingly, both stalls arguably constitute a public place, although this is a jury question. If a person commits an act of public lewdness in the stall at Sears, with the door shut and locked, that person has a reasonable expectation of privacy, even though he is arguably in a public place. See *Buchanan v. State*, 471 S.W.2d 401 (Tex.Cr.App. 1971). If a person commits an act of public lewdness in the stall in the public park, which has no door or curtain, that person has arguably waived any expectation of privacy, but he is arguably in a public place. *Buchanan v. State*, supra.

The second example involves a storeroom or area, restricted to employees only, of a store. This store is open to the public. In this instance, the store itself is undeniably a public place, but the storeroom or restricted area is not open to the public and is therefore arguably a private place. The public or private nature of the storeroom or restricted area, just like the restrooms, is a jury question.

If an employee of this store commits an act of public lewdness in the storeroom or restricted area, and all the doors or curtains leading into the storeroom or restricted area from the portion of the store open to the public are closed, that individual arguably has a reasonable expectation of privacy, and his act has arguably been committed in a private place. However, if the employee committed the same act in the storeroom or restricted area, but he left all the doors or curtains leading into the storeroom or restricted area open three or four inches, that individual would have arguably waived his reasonable expectation of privacy, but his act arguably has still been committed in a private place.

The foregoing examples demonstrate that the issue of whether the appellant had a reasonable expectation of privacy while in booth # 18 should not influence the disposition of his second ground of error. Whether a person has a "reasonable expectation of privacy" and whether an act was committed in a "public" or "private" place are two distinct concepts which the majority erroneously confuse and intertwine with one another.

Moreover, the examples demonstrate that regardless of the appellant's expectation of privacy, the issue of whether the appellant was in a public or private place when the act was committed *was a question for the jury.* The majority, however, have failed to realize that a *jury* could find that a *portion* of a store or other public place could be a private place. Rather, the majority simply finds the evidence sufficient to conclude that booth # 18 was a public place because Mr. Peeper's was a public place. Such logic, or more precisely, the lack of logic, is repugnant to even the simplistic notions of due process.

The evidence clearly revealed that portions of Mr. Peeper's were public places. In fact, the only areas of Mr. Peeper's about which there was conflicting evidence of the public or private nature were the booths and specifically booth # 18. The appellant was arrested in booth # 18 and the illegal conduct allegedly occurred in booth # 18. The only area of Mr. Peeper's relevant to the appellant's guilt or innocence was booth # 18.[11]

It is clear that the trial judge's charge to the jury did not direct the members of the jury to focus their attention *on booth # 18 and whether booth # 18 was a public place.* In *Williams v. State,* 547 S.W.2d 18 (Tex.Cr. App.1977), this Court addressed a trial judge's failure to apply the law to the facts. We there stated that:

11. This is not to say that there may not be instances where the surrounding environment does not affect a determination of whether the conduct occurred in a public or private place. However, merely because the other sections of

"The law must come from the court, the facts must be decided by the jury, and the charge, to instruct the jury properly, must apply the law to the facts raised by the evidence. It is not sufficient for the jury to receive an abstract instruction on the law and then to render a verdict according to a general conclusion on whether the law has been violated. The State must prove its case beyond a reasonable doubt and must prove each element of the offense charged. This is the very basis of the case. The prosecutor as advocate for the State's position may emphasize some elements in his argument and defense counsel as advocate for the accused may emphasize others in his argument, but the court is the only neutral source to which the jury may look for an unbiased application of the law to the facts of the case. An abstract charge does not inform the jury of what facts, if found by it, would constitute proof of the elements of the offense.

\*　　\*　　\*　　\*　　\*　　\*

"It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion. A charge that does not apply the law to the facts fails to lead the jury to the threshold of its duty: to decide those fact issues. A charge that leaves application of the law to the facts solely in the hands of the partisan advocates does not guard against the confusion that such partisan claims inspire." *Williams v. State,* supra at 20.

I am constrained to hold that the trial judge's charge was not only *factually imprecise and needlessly overbroad,* but that it constituted reversible error. I am unable to conclude that the *jury* was apprised that *they* had to find beyond a reasonable doubt that the appellant's conduct occurred in booth # 18 and that booth # 18 was a public place.

Mr. Peeper's, according to both the State and the appellant, are public places does not necessarily mean that booth # 18 could not be a private place.

The appellant's fifth ground of error, which must be considered in conjunction with his second ground of error, is that the trial judge erred by refusing to charge the jury in accordance with the appellant's requested instruction No. 2. The appellant's requested instruction No. 2 states:

"If you find from the evidence, or if you have a reasonable doubt thereof, that booth No. 18 in Mr. Peeper's Book Store at 213 E. 6th Street, as shown by the evidence, was not a 'Public Place' as that term has been defined herein, then you shall acquit the Defendant and say by your verdict 'Not Guilty.'"

It is well settled that when any defensive theory is raised by the evidence, the trial judge must charge the jury on that defensive theory, regardless of "whether the evidence is produced by the State or by the defense, whether it is strong or feeble, whether it is unimpeached or contradicted or whether it is conflicting." 31 Tex.Jur.2d, Instructions, Sec. 110, p. 660, quoted in *Gauthier v. State*, 496 S.W.2d 584 (Tex.Cr.App. 1973).

It is likewise well settled that a trial judge's denial of a defendant's requested instruction is not improper where the requested instruction *is merely an affirmative submission of a defensive issue which merely denies the existence of an essential element of the State's case. Bearden v. State*, 487 S.W.2d 739 (Tex.Cr.App.1972); *Kirkland v. State*, 162 Tex.Cr.R. 424, 285 S.W.2d 743 (1955); *Gilmore v. State*, 158 Tex.Cr.R. 534, 257 S.W.2d 300 (1953).

Whether an act is performed in a public or nonpublic place is an essential element of the offense of public lewdness under V.T.C.A., Penal Code, Section 21.07. *Cf. Brown v. State*, supra. If the trial judge had restricted the jury's consideration of the appellant's conduct to that which occurred in booth # 18, then the trial judge's refusal to give the appellant's requested charge No.

2 would have been proper; it would have been an affirmative submission of a defensive issue which merely denied the existence of an essential element of the State's case. However, the trial judge's failure to have restricted the jury's consideration of the appellant's conduct to that which occurred in both # 18 renders his failure to give the appellant's requested charge No. 2 reversible error;[12] it would not have been an affirmative submission of a defensive issue which merely denied the existence of an essential element of the State's case.

For the reasons set forth above, I vigorously dissent from the majority's treatment of the appellant's second, fifth and ninth grounds of error. The judgment should be reversed and the cause remanded.

PHILLIPS, J., joins in this dissent.

---

12. If the trial judge had incorporated the appellant's requested charge No. 2—even though improperly worded—into the main charge, the error discussed above in the appellant's second ground of error would have been obviated.

The majority's disposition of the appellant's fifth ground of error fails to comprehend the interrelationship between the appellant's second and fifth grounds of error.