**Joseph David LANE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–88–0009–CR.**

Court of Appeals of Texas, Amarillo.

March 29, 1989.

Review Refused June 28, 1989.

Jeff Blackburn, Amarillo, for appellant.

Randall Sherrod, Crim. Dist. Atty., Canyon, John L. Davis, Asst. Crim. Dist. Atty., Canyon, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

DODSON, Justice.

With the trial judge's consent, Joseph David Lane appeals his conviction upon a plea of guilty to the charge of possession of a controlled substance. The trial court assessed his punishment at ten years in the Texas Department of Corrections and a $1,000 fine. The sentence was ordered suspended and appellant was placed on adult probation for a period of ten years. The record reflects that punishment was assessed at the amount recommended by the prosecutor and agreed to by appellant personally and through his attorney. On appeal, he claims the trial court erred by overruling his motion to suppress certain evidence. We affirm.

The record shows that the incident in question occurred at a party clubhouse at an apartment complex in Amarillo. Appellant and others were attending a bachelor party at the clubhouse. The party became very loud and disturbing to the tenants in the apartment complex. The tenants complained to the Amarillo Police Department and on three occasions between 2:00 and 4:00 a.m. the Amarillo police went to the clubhouse to quieten the party. After two unsuccessful attempts to quieten the party, the police (*i.e.*, Officer Landrum), with the party host's concurrence, decided to stop the party.

Officers Landrum, Hill, and Hanke went to the apartment complex upon the third complaint. Officer Landrum lived at the apartment complex and was also employed as a security guard by the management of

the apartment complex. As a security guard Officer Landrum had keys to the party clubhouse, the authority to enter the clubhouse, and the duty to quieten any loud and disturbing conduct. On duty as an Amarillo policeman, Officer Landrum had personally attempted to quieten the party at approximately 3:00 a.m. after another policeman's earlier attempt.

Upon the third complaint, at approximately 4:00 a.m. on the day in question, Officers Landrum, Hill, and Hanke went to the clubhouse at the apartment complex and stopped the party. Attending the party were a number of loud, drunk, and boisterous persons. As the party broke up at the police officers' direction and as the participants were leaving the clubhouse, the police officers heard male voices coming from the ladies' rest room. Officer Landrum directed Officer Hill to clear the rest room.

The record reveals the following dialogue:

Q. [By the prosecutor]: Were you all going to stay there until everybody was gone?

A. [By Officer Hanke]: Yes.

Q. Describe what you all did in regard to the people in the restroom.

A. Okay. Officer Hill attempted to make contact by knocking on the door. There were several voices inside there, as I earlier stated.

One of them asked him who it was, and he said, "it's the police."

Q. And what was their reply?

A. The reply that I heard come out of there was, "Get the fuck out of here."

Q. Did he try again?

A. Yes, he did. It was obvious at that time they did not believe that we was [sic] police officers.

So, Officer Hill again knocked. At this time, they answered again, and this time it was like they was [sic] imitating a female voice, a high, squeaky voice, you know, "Who is this?" like that, you know. And he said, "it's the police."

That voice said, "Do you have any identification?" And he said, "Just open the door and come on out, and I'll show it to you."

And they were laughing, there were sounds of laughter coming out. It was obvious they still didn't believe that we were police officers.

Q. Where was Officer Landrum at this time?

A. He was still across the main body of the main room.

Q. Did he come over to the bathroom door?

A. Yes. I motioned for him to come on over, due to him being employed there as a security officer, also.

Q. Did he know how to get in the bathroom door, or did he try to get in the bathroom door?

A. Yes, he was attempting to get in— he also knocked, and the same type of situation ensued, the laughter, the not believing us as police officers.

And so, he attempted to unlock the door. I don't believe his key fit; it was a regular bathroom-type lock.

Suddenly, they opened the door, and swung it open, and that's when they realized that we were truly police officers.

Q. *One of the people in the restroom opened the door?*

A. *Unlocked it. I believe Officer Landrum opened it.* [emphasis added]

Q. Did you note anything with the door opened?

A. By that time, I had stepped back closer to it, and there was [sic] no more than two or three feet between us at all times, and I did so due to the smell of marijuana cigarettes coming out, the smoke was thick.

Q. Did some officers then go into the bathroom?

A. Yes. Officer Landrum went in first, and then Officer Hill. And as they did so, I heard Officer Landrum ask what was going on.

Then, the next thing he says, "Okay. Put your hands on the wall. You're under arrest."

Well, at this time, I had turned back around and taken a few steps back toward the main body of the room to make

sure everything was all right. We still had a large group out there that was slowly departing.

That's when an altercation broke out behind me, and I went back into the bathroom.

Q. What did you see when you went back into the bathroom?

A. Mr. Lane had his hand stuck in the toilet, was trying to get it flushed. He had his right hand in the toilet and his left hand up there trying to flush it.

Q. Did you get involved in this?

A. Yes, I did.

Q. Tell us what happened.

A. Okay. I grabbed his left hand, which had a handcuff on it, and went to pulling.

As I did, he hit the handle, and it was flushing. He still had his hand down in the toilet.

We took him, turned his back against the wall, face-first into the wall, and got him handcuffed.

Q. What happened then?

A. Okay. After we got him handcuffed, I maintained control of the handcuffs, Officer Landrum turned around to assist Hill. Officer Hill had helped in turned [sic] Mr. Lane around, and sustained an injury to his hand.

Okay. As Officer Landrum was making sure that Officer Hill was all right, I was looking around the room, and that's when I had seen a bottle, a little brown vial, laying down there, a glass mirror, a baggie containing what we believed to be marijuana.

Q. And where were these items, please?

A. The vial was laying by the toilet. There was a leather pouch also laying on the floor.

There was a mirror that had been knocked—I believe it was in the wash basin, I'm not sure on it. There was a razor blade on the floor, there was a razor blade in the toilet.

The record further shows that the rest room was six feet by eight feet and contained one commode and one sink. When the door was opened, the officers saw that the room was full of marijuana smoke. Officers observed a small mirror with a line of white powder on it, which Officer Landrum recognized as cocaine, a small leather case containing a one-gram bottle, and a baggie of marijuana next to the mirror in plain view on the sink. After the brief scuffle with appellant, Officer Landrum placed all three men under arrest for possession of a controlled substance.

By two points of error, appellant asserts that the trial court erred by: (1) violating appellant's right under the fourth amendment to the United States Constitution in overruling his motion to suppress evidence; and (2) violating appellant's right under article I, section 9 of the Texas Constitution in overruling his motion to suppress evidence.

Article I, section 9 of the Constitution of Texas and the fourth amendment of the United States Constitution are, in all material aspects, the same. *Eisenhauer v. State,* 754 S.W.2d 159, 162 (Tex.Crim.App. 1988); *Brown v. State,* 657 S.W.2d 797 (Tex.Crim.App.1983). For that reason, we will analyze the points of error together.

As pertinent here, the fourth amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and shall not be violated...." It is well settled that the fourth amendment "protects people, not places." *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967). The question is what protection the Amendment affords to those people. Generally, the answer requires reference to a place.

The question is not only whether a "reasonable," "justifiable," or "legitimate expectation of privacy" exists in a particular place which has been breached by governmental actions, but also, "who may reasonably, justifiably, or legitimately" harbor that expectation. *Chapa v. State,* 729 S.W. 2d 723, 727 (Tex.Crim.App.1987). The Court pointed out in *Chapa* that:

The litmus for determining the existence of a legitimate expectation of privacy as to a particular accused is twofold: *first,*

did he exhibit by his conduct "an actual (subjective) expectation of privacy[;]" and *second,* if he did, was that subjective expectation "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland,* 442 U.S. [735] at 740, 99 S.Ct. [2577] at 2580, 61 L.Ed.2d [220] at 226–27 [1979].

*Id.* at 727.

In *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387, 401 n. 12 (1978), the Supreme Court observed: "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law *or to understandings that are recognized and permitted by society"* (emphasis added). In this instance, since appellant has no property interest in the premises in question, his alleged expectation of privacy must be by reference to understandings that are recognized and permitted by society.

Appellant relies on *Buchanan v. State,* 471 S.W.2d 401 (Tex.Crim.App.1971), and *Green v. State,* 566 S.W.2d 578 (Tex.Crim. App.1978), to establish his expectation of privacy. However, in *Buchanan* and *Green* the issues involved were whether an individual had an expectation of privacy in a stall within a rest room and the constitutionality of police officers' clandestine observation. The Court in *Buchanan* stated that "[a] toilet stall in a public rest room is private to the extent it is offered to the public for private, however, transient, individual use. [cite omitted] The occupants are entitled to the modicum of privacy its design affords." *Buchanan v. State,* 471 S.W.2d at 404. These cases are distinguished on their facts. In both cases, the police had instigated a clandestine surveillance for the purpose of apprehending persons engaged in illegal sexual acts.

In the present case, the officers were attempting to break up a noisy party upon complaints by neighbors at the owner's direction (*i.e.,* the general direction to Officer Landrum) and with the party host's consent. Here, there was no attempt by the officers to make a clandestine surveillance of either the rest room or appellant and his companions. The officers were not attempting to search either the rest room or appellant. They were simply breaking up a rowdy, out-of-control party.

By our research, we are unable to find a Texas case with facts similar to the case before us. However, *Kirsch v. State,* 10 Md.App. 565, 271 A.2d 770 (Md.Ct.Spec. App.1970), is factually similar to the present case and is helpful in our determination in this instance.

In *Kirsch,* a police officer went to a gas station in response to a call from the station attendant. Upon arrival, the officer met with the attendant who told him that three males were in the rest room, and they had been there for approximately thirty minutes. The attendant did not know if there was anything wrong with the occupants of the rest room. The officer unlocked the door with the key the attendant handed the officer. The officer did not know if anyone was in the rest room, but when he unlocked the door he observed three men with opium and narcotic paraphernalia in their possession in plain view.

The Maryland court stated:

That there may be circumstances ... where a person is afforded Fourth Amendment protection from unwarranted governmental intrusion into *particular areas within a public rest room,* does not mean that an individual who may intend to avail himself of exclusive occupancy of the whole of such a public facility is thereby constitutionally insulated for as long as he wishes from unwelcome scrutiny of his action.... Assuming it not unreasonable for a person given the key to a rest room in a gas station to expect a measure of privacy therein, *that expectation of privacy is necessarily limited to that which is justifiable and reasonable;* and what they encompass depends upon and is controlled by the circumstances of each case. *At best, the expectation of privacy* in a free restroom, facility, or any part of it, which is intended to be accessible for *public use cannot be other than temporary.* And where ... no reasonable person would be justified in expect-

ing absolute privacy in, or exclusive use of such a facility, particularly where the length of such occupancy and use far exceeded, as here, normally permissible limits.

*Id.* at 772.

The Court concluded that because there is no war between the Constitution and common sense, the police officer violated no constitutionally protected right of appellant to privacy under the Fourth Amendment.

We, too, do not quarrel with common sense. It does not appear from the record that the officers intended to conduct a "search" in the constitutional sense. Their entry was made out of concern for complaining residents and to fulfill the purpose for which they had been called—to terminate a noisy party. Under the circumstances presented, we are not persuaded that appellant carried his burden of showing that he had a legitimate and reasonable expectation of privacy in the area in question.

Even if we assume arguendo that appellant exhibited a subjective expectation of privacy, that expectation is not one which the law recognizes as legitimate. A "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered while committing an illegal act. *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387, 401 n. 12. As the Court observed in *Rakas:*

> A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognized as "legitimate." His presence, in the words of *Jones,* [*v. U.S.* ] 362 US [257] at 267, 4 L Ed 2d 697, 80 S Ct 725 [734], 78 ALR2d 233, [1960] is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 US, [347] at 361, 19 L Ed 2d 576, 88 S Ct 507 [at 516] (1967) (Harlan, J., concurring).

*Id.*

In our view, appellant could reasonably and legitimately expect privacy in the facility in question for no more than a brief period of time to use the facility for its intended purpose. Here, the evidence indicates a contrary intent, in that appellant is occupying a ladies' rest room with two men with no objective evidence of intent to use the facility for its intended purposes. Under the circumstances presented, appellant has failed to establish a legitimate expectation of privacy in the facilities in question which society is prepared to recognize as reasonable (*i.e.,* the prolonged use of a facility to conceal the commission of an illegal act when the perpetrator can expect no more than a brief use of the facility for its intended purposes).

Appellant's two points of error are overruled and the trial court's judgment of conviction is affirmed.