COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-302-CR

 

JERRY
WAYNE GILMORE                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

FROM THE 213TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

MEMORANDUM OPINION[1]

 

                                              ------------

 

I.  Introduction

 








A jury
convicted Appellant Jerry Gilmore of the manufacture of more than 400 grams of
a controlled substance (methamphetamine), and the trial court sentenced him to
thirty years= incarceration.  In eight points, Gilmore contends that the
evidence was legally and factually insufficient to establish that he was
present during the manufacturing process and to establish that he manufactured
over 400 grams of methamphetamine; that the statutory definition of a
controlled substance is unconstitutionally vague as applied to him; that the
trial court erred by denying a specific jury instruction; and that the
prosecutor made an improper comment on Gilmore=s choice
to not testify at trial, which should have caused a mistrial.  We will affirm.

II.  Legal and
Factual Sufficiency Points

A.     Standards of Review

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all the evidence in the light most favorable to the prosecution in order
to determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).








This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235
S.W.3d at 778.  The trier of fact is the
sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).  We must presume that the fact-finder resolved
any conflicting inferences in favor of the prosecution and defer to that
resolution.  Jackson, 443 U.S. at
326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex.
Crim. App. 2005).  We then ask whether
the evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s determination is manifestly
unjust.  Watson, 204 S.W.3d at
414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.

B.     Jury Verdict Finding Gilmore Guilty of Manufacturing 

Methamphetamine

 

Gilmore
first argues that the evidence was legally and factually insufficient to tie
him to the scene where the methamphetamine was manufactured.  A jury can find a person guilty of
manufacturing a controlled substance if the State proves that the person
knowingly and intentionally chose to manufacture such a substance.  Tex.
Health & Safety Code Ann. '
481.112(a) (Vernon 2003). 
Methamphetamine is a controlled substance.  Id. ' 481.102(6).  For the State to obtain a conviction for the
manufacture of a controlled substance, the State must affirmatively link[2]
the defendant either to an interest in the place where the manufacturing
occurred or to the actual act of manufacturing. 
See East v. State, 722 S.W.2d 170, 172 (Tex. App.CFort
Worth 1986, pet. ref=d); Harris v. State, No.
02-04-00202-CR, 2005 WL 1838976, at *1 (Fort WorthCAug. 4,
2005, pet. ref=d) (mem. op.) (not designated
for publication). 








In the
typical drug possession case, the State is required to link the
defendant to the drug in order to protect the innocent bystander from
conviction based solely upon his proximity to someone else=s
drugs.  Poindexter v. State, 153
S.W.3d 402, 406 (Tex. Crim. App. 2005); Harris, 2005 WL 1838976, at
*1.  In a drug manufacturing case,
however, while the State must still provide a link, the purpose of such a
requirement is to protect the innocent bystander who merely inadvertently
happens onto a methamphetamine lab.  Harris,
2005 WL 1838976, at*1.

Although
the analysis is basically the same whether the offense is the possession of a
controlled substance or the manufacture of a controlled substance, the factors
considered may be different.  East,
722 S.W.2d at 172; Harris, 2005 WL 1838976, at *1.  For example, manufacture of methamphetamine
occurs in the open, as opposed to possession, which may occur in a drawer or an
envelope.  East, 722 S.W.2d at
171-72; Harris, 2005 WL 1838976, at *1. 
Also, the manufacture of methamphetamine typically generates a strong
odor, not merely a residual odor.  See
East, 722 S.W.2d at 171-72; Harris, 2005 WL 1838976, at *1.  








Furthermore,
the paraphernalia used in methamphetamine manufacturing are relatively
cumbersome and typically are in plain view, and the quantity of contraband
produced is relatively high.  See East,
722 S.W.2d at 172; Harris, 2005 WL 1838976, at *1.  As a consequence, the fact that a defendant
has a prolonged presence on the premises weighs more heavily against that
defendant when methamphetamine is being manufactured on the premises than it
does in a mere possession case.  See
East, 722 S.W.2d at 172; Harris, 2005 WL 1838976, at *1.








In this
case, the jury heard a substantial amount of circumstantial evidence linking
Gilmore to the manufacture of the methamphetamine.  First, the State presented the testimony of a
police officer who conducted surveillance of the house where, later that day,
police discovered the methamphetamine lab while executing a search
warrant.  The officer testified that when
he arrived at approximately 8:15 a.m., he saw two vehicles parked in front of
the house (one of which was a blue pickup truck), and that approximately one
hour later he saw Gilmore and another man exit the house, get into the blue pickup
truck, and leave the house.  That officer
testified that during this time, he did not see anyone else go into or leave
the house.  On cross examination, the
officer admitted that one of the vehicles parked in front of the house
obstructed his view of the front door. 
But the officer was steadfast in his testimony that he clearly saw
Gilmore and another male come from the front of the residence before leaving in
the truck.  This officer also testified
that he continued to watch the house after Gilmore and his associate left and
that no one else went into or even drove by the house. 

A second
police officer testified that he also staked out the residence in question in a
separate unmarked vehicle on the same block that morning.  He tailed the blue pickup truck when it left
the house, and he followed the truck to a nearby convenience store.  This officer testified that, after coming out
of the store, Gilmore and his associate drove in the direction of the
residence.  The jury never heard whether
Gilmore and his associate reached their destination or the circumstances of
their ultimate arrest.[3]








Approximately
two hours later, around 11:00, a police unit arrived at the house and executed
a search warrant.  The State presented
testimony that when the police executed the search warrant, the strong smell of
ammonia, a smell commonly associated with methamphetamine labs, permeated the
front yard, the interior of the house, and especially the back yard, where the
smell was the strongest.  Police observed
a liquid petroleum gas tank in the back yard, and it had a blueish discoloration
at its valve, which is consistent with a discoloration made by anhydrous
ammonia.  Inside the house, police
discovered a variety of containers, substances, liquids, and products in the
house indicating methamphetamine manufacturing. 
Pictures taken by the police of items found in the house were admitted
into evidence and reflected that the police discovered several plastic
containers, mounds of empty Sudafed boxes, along with their emptied blister
packs, several cans of starter fluid, coffee filters, and large containers of
salt.  These pictures also showed a
blender (which, testimony established, contained a residue of ground
pseudoephedrine) and a hot plate taken from inside the house.  The items found at the house were Atypical
of a clandestine methamphetamine lab, a Nazi lab.@ 








The
State spent a great deal of time, however, on a single tub of liquid found in
the kitchen sink.  The jury heard from
both police and private forensic experts who testified that when the police
discovered this plastic tub, it contained a complex, bubbling liquid.  This liquid, according to the testimony, was
bubbling because of a chemical reaction of its various mixed ingredients, which
included anhydrous ammonia and ground Sudafed tablets.  The result of this reaction was approximately
12.3 grams of pure methamphetamine. 
Testimony established that, while the police interrupted the process too
early to establish an exact time frame, the concoction could have been mixed
approximately three to four hours before the police discovered it, which would
place the mixture time at approximately 8:00 a.m. that morning.  Gilmore=s
fingerprint was on this tub of bubbling, methamphetamine-producing liquid.  Gilmore=s
attorney questioned several of the forensic experts concerning that
fingerprint.  The attorney consistently
elicited testimony that there was no way to determine when the fingerprint was
left on the container, how long it had been there, or the circumstances of its
placement on the container. 

In his
defense, Gilmore briefly re-called the original investigating officer and
elicited testimony that this officer had driven by the house in the morning
before going to get the search warrant. 
Gilmore=s questions related to the
placement of the blue pickup truck at the house and whether the officer checked
the registration or ran the license plates on the vehicle.  Gilmore did not call any other witnesses to
testify on his behalf and he did not, himself, testify.  On appeal, Gilmore points out that his associate
provided police with a key to the residence so that the police could execute
the search warrant, that mail at the residence was addressed to the associate,
and that one of the associate=s
business cards was at the residence.








Viewing
the evidence in the light most favorable to the prosecution, we hold that the
evidence is legally sufficient to support the jury=s
determination that Gilmore, beyond a reasonable doubt, knowingly and
intentionally manufactured methamphetamine. 
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789.  First, a police officer who could see the
entire front of the residence, except for the front door, sat in front of the
house for approximately one hour and then saw Gilmore come from the front of
the house.  From this the jury could have
reasonably inferred that Gilmore must have come from inside the house and that
he was there for at least the approximate hour between the time that the
officer arrived at the stakeout and the time Gilmore left.

Furthermore,
the jury heard evidence that the odor of ammonia was very strong in the house
itself, that there were multiple items commonly associated with methamphetamine
manufacturing in plain view in the house, and that methamphetamine was being
manufactured in the house.  Importantly,
the jury had fingerprint evidence directly connecting Gilmore to a tub of
liquid where an ongoing chemical reaction was actually producing
methamphetamine when the police entered the house.  We presume that the jury resolved the
conflicting inferences about when the fingerprint was left on the tub in favor
of the prosecution, and we defer to the jury=s
apparent resolution that Gilmore must have left the fingerprint while he was
involved in manufacturing methamphetamine in the tub that morning.  See Jackson, 443 U.S. at 329, 99 S.
Ct. at 2793.








Based on
this evidence, the jury could have reasonably inferred that Gilmore did not
innocently and inadvertently happen onto a methamphetamine lab, but was an
active participant in the drug manufacturing process.  See East, 722 S.W.2d at 172; Harris,
2005 WL 1838976, at *1.  Thus, the
evidence was legally sufficient to support the jury=s
finding that Gilmore manufactured methamphetamine.

Having
determined that the evidence was legally sufficient to support his conviction,
we must additionally evaluate whether the evidence was factually
sufficient.  Viewing the entire record in
a neutral light, we cannot say that the evidence was so weak that the
fact-finder=s determination was clearly
wrong and manifestly unjust.  See
Watson, 204 S.W.3d at 414.  While it
is true that there was no evidence of the arrest itself presented at trial (or
whether Gilmore tried to flee, possessed any drugs or money, or was impaired by
drug use at the time of the arrest), the jury did hear evidence linking Gilmore
to the tub of methamphetamine-producing liquid. 
And although some items found at the residence linked Gilmore=s
associate more closely to the residence than Gilmore, we nonetheless cannot say
that the evidence presented by the State was so greatly outweighed by
conflicting evidence that the fact-finder=s
determination was manifestly unjust.  Watson,
204 S.W.3d at 414-15, 417.  Accordingly,
we overrule Gilmore=s second point.

C.     Jury Verdict Finding Gilmore Guilty of Manufacturing More Than           400 Grams of Methamphetamine 

 








Gilmore
additionally argues that the evidence was legally and factually insufficient to
establish that he manufactured the quantity of 400 grams or more of
methamphetamine.  The indictment alleged
that Gilmore did Aintentionally OR knowingly
manufacture a controlled substance, namely methamphetamine of more than four
hundred grams, including any adulterants or dilutants.@  The indictment tracks section 81.112(f) of
the Texas Health and Safety Code, providing that manufacture of a controlled
substance in Penalty Group One is a first-degree felony Aif the
amount of the controlled substance to which the offense applies is, by
aggregate weight, including adulterants or dilutants, 400 grams or more.@  Tex.
Health & Safety Code Ann. ' 481.112(f)
(emphasis added).  An adulterant or
dilutant Ameans any material that
increases the bulk or quantity of a controlled substance, regardless of its
effect on the chemical activity of the controlled substance.@  Id. ' 481.102(49).

At
trial, a state-sponsored forensic chemist testified that the tub bearing
Gilmore=s
fingerprint contained approximately 1,950 grams of moderately bubbling liquid,
12.3 grams of which was pure methamphetamine. 
The rest of the liquid was byproduct, unreacted pseudoephedrine,
solvent, and undissolved binder.  The
State additionally elicited the following testimony from the chemist:

[Prosecutor]:  [A]re you familiar with the definition
contained in the Health and Safety Act about what a controlled substance
is? . . . The definition of a controlled substance where it
talks about including in a drug B a drug, an adulterant, and a dilutant of which
the term includes the aggregate weight of any mixture or solution or other
substance containing a controlled substance?








[Chemist]:  Yes, sir.

 

[Prosecutor]:  Based on that definition . . . would it be
your testimony that the items we=ve talked about here containing methamphetamine
contained more than 400 grams based on that definition?

 

[Chemist]:  Yes, sir.

 

On cross
examination, Gilmore=s attorney elicited testimony
from the chemist that while the solvents technically add bulk to the
methamphetamine, the purpose of the solvents is to facilitate methamphetamine
productionCto separate the substances so as
to result in a pure methamphetamine. 
Therefore, the chemist testified, that in his opinion and under
his interpretation of the statute, the solvents should not count as an
adulterant or dilutant but rather as Atrash@ in the
manufacturing process. 








Notwithstanding
the forensic chemist=s admitted Aopinion,@ the
jury heard testimony that the total weight of the liquid in the tub with
Gilmore=s
fingerprint on it was almost five times more than 400 grams, and that the
non-methamphetamine portion of the liquid consisted of other products used in
the manufacture of methamphetamine. 
Viewing this evidence in the light most favorable to the prosecution,
any rational trier of fact could have found Gilmore guilty of manufacturing
more than 400 grams of methamphetamine under the statutory definition, which,
as the jury heard, includes not only pure methamphetamine but also adulterants
and dilutants.  Id. '' 481.102(40),
.112(f); Jones v. State, 235 S.W.3d 783, 786 (Tex. Crim. App. 2007).
Accordingly, we overrule Gilmore=s third
point.  

Having
determined that the evidence was legally sufficient to support the jury=s
verdict, we must now address Gilmore=s
argument that the evidence was factually insufficient.  See Watson, 204 S.W.3d at 414.  Looking at all the evidence in a neutral
light, even if the jury only considered the tub to which the State directly
linked Gilmore, the evidence was clear and undisputed that the tub contained
approximately 1,950 grams of liquid. 
Therefore, we cannot say that the determination that Gilmore
manufactured more than 400 grams of methamphetamine under the statutory
definition of what the jury must include in its calculation of the Aamount@ of the
controlled substance that was manufactured was clearly wrong or manifestly
unjust.  See Jones, 235 S.W.3d at
786.  The great weight and
preponderance of the evidence does not contradict the jury=s
verdict.  See id.  Accordingly, we overrule Gilmore=s fourth
point.

III. 
Constitutionality of the Applicable Statute








Gilmore=s fifth
point of error is that the statutory definition of Acontrolled
substances@ is unconstitutionally vague as
applied to him in violation of his Due Process and Equal Protection
rights.  There are two types of
challenges to the constitutionality of a statute:  that the statute is unconstitutional as
applied to the defendant or that the statute is unconstitutional on its
face.  Barnett v. State, 201
S.W.3d 231, 232-33 (Tex. App.CFort
Worth 2006, no pet.).  Gilmore asserts on
appeal only that the statute is constitutional as applied to him.[4]  An as-applied constitutional challenge must
be raised in the trial court to preserve error. 
Curry v. State, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); Barnett,
201 S.W.3d at 232-33; Burton v. State, 194 S.W.3d 686, 688 (Tex. App.CHouston
[1st Dist.] 2006, no pet.); Toma v. State, 126 S.W.3d 528, 529 (Tex.
App.CHouston
[1st Dist.] 2003, pet. ref'd).  Because
Gilmore failed to request that the trial court find the statute
unconstitutional as applied to him, Gilmore has waived this argument on appeal.  See, e.g., Burton, 194 S.W.3d at
688.  We therefore overrule Gilmore=s fifth
point.

IV.  Jury
Charge








In his
sixth point of error, Gilmore complains that the trial court erred by denying
his requested jury instruction on mere presence.  Gilmore requested that the trial court
include an instruction that Amere
presence at the scene where contraband is found is not sufficient evidence to
convict@ Gilmore
of the manufacturing charge.  The trial court
denied Gilmore=s request. 

Appellate
review of error in a jury charge involves a two-step process.  Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred. 
If so, we must then evaluate whether sufficient harm resulted from the
error to require reversal.  Id. at
731-32.  Error in the charge, if timely
objected to in the trial court, requires reversal if the error was Acalculated
to injure the rights of [the] defendant,@ which
means no more than that there must be some harm to the accused from the
error.  Tex.
Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); see also Abdnor,
871 S.W.2d at 731-32; Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim.
App. 1985) (op. on reh=g).  

In other
words, a properly preserved error will require reversal as long as the error is
not harmless.  Almanza, 686 S.W.2d
at 171.  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Id.; see also Ovalle v. State,
13 S.W.3d 774, 786 (Tex. Crim. App. 2000).








Upon
timely request, an accused is entitled to an affirmative defense instruction on
every issue raised by the evidence, whether it is strong, feeble, unimpeached,
or contradicted, and even if the trial court is of the opinion that it is not
entitled to belief.  Warren v. State,
565 S.W.2d 931, 933-34 (Tex. Crim. App. 1978). 
The trial court is required to give an instruction on every defensive
issue when properly requested.  Golden
v. State, 851 S.W.2d 291, 295 (Tex. Crim. App. 1993).  However, mere presence is not a statutorily
recognized affirmative defense, and the trial court need not necessarily
include it in a jury charge.  Williams
v. State, 906 S.W.2d 58, 64 (Tex. App.CTyler
1995, pet. ref=d).  When an alleged defensive theory, such as Amere
presence,@ serves only to deny the
existence of an essential element of the State=s case,
an affirmative charge on the theory is not required.  Green v. State, 566 S.W.2d 578, 584
(Tex. Crim. App. 1978).  In such an
instance, instructing the jury on the State=s burden
to prove guilt beyond a reasonable doubt adequately protects a defendant.  Williams, 906 S.W.2d at 64.








First,
in this case, there was no evidence presented raising Amere
presence@ apart
from Gilmore=s attorney=s
assertions during closing arguments. 
Rather, the record includes evidence from which the jury could draw
inferences that were contrary to Gilmore=s mere
presence in the houseCfingerprint evidence directly
linking Gilmore to a tub of liquid actually producing methamphetamine, evidence
from which a reasonable person could infer as officers directly observing
Gilmore exit the house after being there for at least one hour starting at
around 8:15 a.m., and evidence that the bubbling mixture in the tub bearing
Gilmore=s
fingerprint could have been mixed within the three to four hours before the
police discovered it (which would possibly put the mixture time at
approximately 8:00 a.m. that morning). 

Furthermore,
even if Gilmore had presented evidence that he was merely present at the time,
his requested instruction is an affirmative charge on a defensive theory which
serves only to negate the element of intentional and knowing participation in
the manufacture of methamphetamine.  See
Green, 566 S.W.2d at 584.  Therefore,
the trial court was not required to include a mere presence instruction.  See Williams, 906 S.W.2d at 64.  The jury charge properly instructed the jury
on the State=s burden to establish guilt
beyond a reasonable doubt, and this instruction was adequate.  See id. 
Because error did not occur in the jury charge, we overrule Gilmore=s sixth
point.  See Abdnor, 871 S.W.2d at
731.

V.  Improper
Comment by the Prosecutor During Closing Arguments

Gilmore=s
seventh and eighth points deal with the following exchange during closing
arguments at the guilt phase of the trial:








[Prosecutor]: You have
got a fingerprint on a bubbling container of manufactured methamphetamine.  Now, this [d]efendant and [defense attorney]
want to run away from that as far and as fast as they can.

 

[Defense Attorney]:
Objection . . . . 

 

The Court: Sustained.

 

[Defense Attorney]: Ask
that the jury be instructed to disregard the impropriety and not draw any
inferences from the comments made by the government=s attorney.

 

The Court: The jury is
instructed to disregard that portion of argument.

 

[Defense Attorney]: . . .
I would ask for a mistrial, Your Honor.

 

The Court: Denied.

 

Gilmore
argues that the prosecutor=s remark
was an improper comment on his choice not to testify at trial and that the
trial court erred by not granting his motion for a mistrial.[5]

A
comment on an accused=s failure to testify violates
the accused=s state and federal
constitutional privileges against self-incrimination.  Montoya v. State, 744 S.W.2d 15, 34
(Tex. Crim. App. 1987) (op. on reh=g); Smith
v. State, 65 S.W.3d 332, 339 (Tex. App.CWaco
2001, no pet.).  In addition, the Code of
Criminal Procedure mandates that








Any defendant in a
criminal action shall be permitted to testify in his own behalf therein, but
the failure of any defendant to so testify shall not be taken as a circumstance
against him, nor shall the same be alluded to or commented on by counsel in the
cause.

 

Tex. Code Crim. Proc. Ann. art.
38.08 (Vernon 2005).

To determine if a
prosecutor=s comment violated article 38.08 and
constituted an impermissible reference to an accused=s failure to
testify, we must decide whether the language used was manifestly intended or
was of such a character that the jury naturally and necessarily would have
considered it to be a comment on the defendant=s failure to
testify.  Id.; see Bustamante
v. State, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); Fuentes v. State,
991 S.W.2d 267, 275 (Tex. Crim. App.), cert. denied, 528 U.S. 1026
(1999).

The offending
language must be viewed from the jury=s standpoint, and
the implication that the comment referred to the accused=s failure to
testify must be clear.  Bustamante,
48 S.W.3d at 765; Swallow v. State, 829 S.W.2d 223, 225 (Tex. Crim. App.
1992).  A mere indirect or implied
allusion to the defendant=s failure to testify does not violate the
accused=s right to remain
silent.  Wead v. State, 129 S.W.3d
126, 130 (Tex. Crim. App. 2004); Patrick v. State, 906 S.W.2d 481,
490-91 (Tex. Crim. App. 1995), cert. denied, 517 U.S. 1106 (1996).








Nothing
in the record suggests that the prosecutor manifestly intended to comment on
Gilmore=s
failure to testify.  See Wead, 129
S.W.3d at 130.  Furthermore, we cannot
say from the jury=s standpoint, that the comment
was a clear attack on Gilmore=s choice
to not testify.  See Bustamante,
48 S.W.2d at 765.  The prosecutor=s
remarks were more likely seen as a reference to Gilmore=s
constant attempts to establish, during his cross examination of expert
witnesses, that it was impossible to determine when Gilmore=s
fingerprint was made on the tub of methamphetamine.

Therefore,
the record shows no abuse of discretion on the part of the trial court in
denying Gilmore=s motion for mistrial.  See Wead, 129 S.W.3d at 130.  Moreover, on this record, a reasonable trial
court could have concluded that an instruction to disregard would effectively
remove any possible prejudice caused by the prosecutor=s
comment.  See id.  Accordingly, we overrule Gilmore=s
seventh and eighth points.

VI.  Conclusion

Having overruled all of
Gilmore=s points, we affirm the
trial court=s judgment.                                               

 

 

SUE WALKER

JUSTICE

 

PANEL F:    GARDNER, WALKER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)








DELIVERED:
March 13, 2008











[1]See Tex. R. App. P. 47.4.





[2]The court of criminal
appeals has noted that the Aaffirmative links@ rule is not an
independent test of legal sufficiency, and because the term may imply a rule
independent from the legal sufficiency test, use of the term Alink@ is the better practice.  Evans v. State, 202 S.W.3d 158, 162
n.9 (Tex. Crim. App. 2006).  We similarly
hereinafter use the term Alink@ in this opinion.





[3]The trial court granted
Gilmore=s motion to suppress and
suppressed Aany fruit of the arrest and/or
detention of the defendant in this case.@  The trial
court ruled, however, that Aany challenges to the search of the actual
residence are denied.@ 





[4]Indeed, the court of
criminal appeals has rejected all facial constitutional challenges to Texas
Health and Safety Code section 481.002(5). 
See Wright v. State, 201 S.W.3d 765, 767 (Tex. Crim. App.
2006); Seals v. State, 187 S.W.3d 417, 422 (Tex. Crim. App. 2005); Melton
v. State, 120 S.W.3d 339, 343-44 (Tex. Crim. App. 2003); Ex parte
Kinnett, No. AP-75,611 (Tex. Crim. App. Feb. 13, 2008), available at http://www.cca.courts.state.tx.us/OPINIONS/

PDFOPINIONINFO2.ASP?OPINIONID=16530&FILENAME=AP‑75,611.PDF.





[5]The State argues in its
appellate brief that Gilmore=s objection was too broad to preserve error.  However, Gilmore specifically noted that the
comment violated Gilmore=s right to the
protections of the Fifth Amendment of the United States Constitution.  Therefore, we will address the merits of
Gilmore=s points.